**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

VIRGINIA BURGIN; JOSEPH K. BURGIN,
<u>Plaintiffs-Appellants,</u>

v.

OFFICE OF PERSONNEL MANAGEMENT,

No. 96-1289

<u>Defendant-Appellee,</u>

and

HEALTHPLUS, INCORPORATED,
<u>Defendant.</u>

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-95-1793-AW)

Argued: May 6, 1997

Decided: August 7, 1997

Before MURNAGHAN and NIEMEYER, Circuit Judges, and
STAMP, Chief United States District Judge for the
Northern District of West Virginia, sitting by designation.

_____

Reversed and remanded by published opinion. Judge Niemeyer wrote
the opinion, in which Judge Murnaghan and Chief Judge Stamp
joined.

_____

**COUNSEL**

**ARGUED:** Joseph Martin Gorvoy, FERRIS, HANSEN & GORVOY,
Greenbelt, Maryland, for Appellants. George Levi Russell, III, Assis-

tant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

_____

**OPINION**

NIEMEYER, Circuit Judge:

We must determine in this case whether the United States Office of Personnel Management ("OPM") acted arbitrarily, in abuse of its discretion, or otherwise not in accordance with law in affirming the denial of health insurance coverage to a federal employee. The employee claimed coverage for his wife under a health plan that HealthPlus, Inc. issued pursuant to a contract with OPM to provide insurance in accordance with the Federal Employees Health Benefits Program. After HealthPlus denied coverage and the OPM affirmed the decision, the employee filed this action. On OPM's motion for summary judgment, the district court affirmed OPM's decision. We reverse and remand.

I

Joseph K. Burgin, a retired federal employee, and his wife, Virginia, were covered by health insurance provided pursuant to the Federal Employees Health Benefits Program. The health insurance in force during the period at issue in this case was provided by Health-Plus, Inc. pursuant to a contract it had with OPM for the benefit of federal employees.

In September 1993, Virginia Burgin suffered a cardiac arrest, and as a result of a lack of oxygen to her brain, she lapsed into a coma from which she never recovered. In December 1993, Mrs. Burgin was transferred from the hospital to the Regency Nursing and Rehabilitative Treatment Center ("Nursing Center") in Forestville, Maryland, where she remained until her death in September 1995.

In January 1994, Joseph Burgin made a claim to HealthPlus to pay for his wife's stay at the Nursing Center. He relied on the language

2

of HealthPlus' policy that "[t]he Plan provides a comprehensive range of benefits with no limit as to dollars or days when full-time skilled nursing care is necessary and confinement in a skilled nursing facility is medically appropriate as determined by a Plan doctor. You pay nothing. All necessary services are covered." (Emphasis in original). HealthPlus, however, denied coverage, relying on a Plan exclusion for "custodial care, rest cures, domiciliary or convalescent care." It invited Burgin to submit additional medical reports in support of reconsideration.

Burgin then obtained a letter from Dr. George C. Hajjar, Mrs. Burgin's treating physician and a "Plan doctor." Dr. Hajjar stated:

> [Mrs. Burgin] is fed via a gastrostomy tube, is given insulin injections twice a day, and breathes through a tracheostomy tube that requires suctioning several times a day. All of the above treatments are considered "skilled care." These treatments require the 24 hour supervision of a licensed nurse. Therefore, Mrs. Burgin does require "skilled care" rather than merely custodial care.

Burgin obtained a second letter from the Nursing Center, which reported Mrs. Burgin as suffering from anoxic encephalopathy secondary to cardiac arrest, seizure disorder, insulin dependent diabetes mellitus, coronary artery disease, and tracheostomy and gastrostomy tube placement and described eight separate procedures regularly required by Mrs. Burgin that under federal and state law must be performed by Licensed Practical Nurses under the supervision of the attending physician and Registered Nurses. The Nursing Center's letter also stated that Mrs. Burgin was considered to require skilled nursing care under the existing Medicaid and Medicare regulations.

When HealthPlus did not respond to Mr. Burgin's submissions and repeated claims for coverage, Burgin complained to the Maryland Insurance Administration. The Administration submitted Mrs. Burgin's records to an independent nursing evaluator associated with Sinai Hospital of Baltimore and obtained an appraisal of Mrs. Burgin's care needs. The evaluator wrote a letter concluding:

> This patient, by virtue of receiving Insulin twice daily, in addition to management of a tracheostomy, foley catheter

3

and a gastrostomy tube for nutrition and medications clearly falls within the criteria for skilled care.

What was not identified in her medical history, but no doubt is a very critical part of her plan of care is the neurological and cardiopulmonary monitoring and evaluation that must occur given that she is bedbound and unresponsive. She is also at risk for complications arising from compromised skin integrity resulting in decubitus ulcers. All of these activities are considered skilled.

There is no question that the care necessary to maintain an appropriate level of medical management must continue to be of a skilled nature.

The Maryland Insurance Administration sent a copy of this letter to HealthPlus, requesting reconsideration of their denial of coverage to the Burgins. HealthPlus responded that the Maryland Insurance Administration had no jurisdiction over this matter of federal employee health benefits coverage, and the Maryland Insurance Administration took no further action.

Finally, Mr. Burgin sought help from Congressman Albert Wynn, who intervened on behalf of the Burgins and appealed to OPM, forwarding to OPM the three letters obtained by Burgin about his wife's condition and her need for skilled nursing care. OPM then contacted HealthPlus, which responded by reaffirming its denial of coverage under the exclusion for custodial care. In a letter to OPM, HealthPlus stated its position:

[Care provided to Mrs. Burgin] is clearly custodial in nature as it primarily supports activities of daily living (feeding, bathing, turning, elimination of bodily waste etc.). This care is necessary because Mrs. Burgin is not capable of independently sustaining her bodily functions. The fact that the custodial services being provided, such as turning, feeding, passive range of motion exercises, skin care and the taking of vital signs, are performed by nursing or ancillary health care personnel does not change the essential nature of the

4

services themselves; they remain custodial since they serve to support activities of daily living.

HealthPlus added that the Burgins would receive coverage for acute and emergency problems, such as pneumonia or a hip fracture, explaining, "This acute care would be covered because it would be definitive medical treatment provided for a specific condition which could be treated and resolved."

After considering HealthPlus' letter, Kenneth A. Lease, Chief of Health Benefits Division of OPM, wrote Congressman Wynn that OPM was affirming HealthPlus' denial of coverage for the Burgins. Lease stated that "[t]he issue in this case is whether Mrs. Burgin is receiving medically necessary skilled nursing care to aid her in her treatment, or custodial care designed primarily to assist her with activities of daily living, such as hygiene and nutrition." Lease then went on to repeat HealthPlus' position which concluded that the services being rendered to Mrs. Burgin were "primarily in support of activities of daily living."

On seeing Lease's letter, Burgin requested that OPM conduct a formal review and reconsideration. With his request, Burgin attached the three letters relating to Mrs. Burgin's condition and needs, two definitions of "skilled nursing care," and his wife's medical records. Without any formal hearing, for which the regulations make no provision, OPM reaffirmed HealthPlus' denial of coverage. Repeating its view that the proper inquiry was "whether Mrs. Burgin is receiving skilled nursing care designed to treat her condition so that she will get better, or whether the nature of her care is custodial; that is, care designed mainly to support her living functions," OPM stated that there was "no indication that the care is designed or likely to treat and solve her medical condition" and that it thus had "no contractual basis to compel the Plan to provide benefits." OPM also informed Burgin that he had exhausted his administrative review rights and was free to file suit in federal court.

Burgin filed this action against OPM directly, complying with OPM's regulation that suit not be brought against the private insurance carrier. See 5 C.F.R. § 890.107(c). On OPM's motion, the district court entered summary judgment for OPM, ruling that OPM's

5

action in affirming HealthPlus' denial of coverage was not "arbitrary and capricious" and that there was no evidence that OPM's interpretation of the Plan was "plainly erroneous or inconsistent with the plain language of the Plan." The court concluded that it would not substitute its judgment for that of the agency, even if it would have reached a different conclusion. This appeal followed.

II

On the motion for summary judgment, the district court had before it only a sparse agency record composed of the health plan, three medical opinions supplied by Burgin, and the decisions of HealthPlus and the OPM employee authorized to review private carriers' coverage determinations. See 5 C.F.R. § 890.105(e). But the district court's review based only on the administrative record complied with the dictates of the Administrative Procedure Act, which states that a court's review of any final agency action must be made on the "whole record" that was before the agency, even in a case -- such as that before us -- in which the agency action was the result of informal procedures. See 5 U.S.C. § 706; Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985).* Our review of the district court's summary judgment is de novo and duplicates the district court's review of the OPM determination. See id. at 744.

The Administrative Procedure Act defines the scope of review as to both legal and factual questions. It reads:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law . . . and determine the meaning or applicability of the terms of an agency action. The reviewing court shall --

_____

*While the OPM purports to limit by regulation the scope of judicial review, even imposing a limitations period, see  5 C.F.R. § 890.107(d)(2), without citing supporting statutory authority, its regulatory limitation of judicial review to the record before the OPM, see 5 C.F.R. § 890.107(d)(3), has support in the Administrative Procedure Act, 5 U.S.C. § 706. Because no party has challenged these regulations, we need not explore further OPM's authority.

6

* * *

    (2) hold unlawful and set aside agency action, findings, and conclusions found to be --

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

5 U.S.C. § 706. We show substantial deference to an agency's interpretations of its own regulations, see, e.g., Martin v. Occupational Safety and Health Review Commission, 499 U.S. 144, 150-51 (1991), relying on the "agency's unique expertise and policymaking prerogatives." Id. at 151. "When the administrative interpretation is not based on expertise in the particular field, however, but is based on general common law principles, great deference is not required." Jicarilla Apache Tribe v. Federal Energy Regulatory Commission , 578 F.2d 289, 292-93 (10th Cir. 1978) (overturning an agency determination that payment-in-kind of gas royalties under a standard government form contract constituted a "purchase" under FERC regulations); see also Texas Gas Transmission Corp. v. Shell Oil Co. , 363 U.S. 263, 270 (1960) (noting that court of appeals correctly made independent determination of application of contract principles). Thus, although we would defer to the agency's determination of whether a health benefits contract meets regulatory requirements, here, the dispute is not to be resolved by reference to the regulatory provisions governing the features of an acceptable contract. Rather, the essential question is one of the interpretation of the contract's language, a question of law clearly within the competence of courts, see Scarborough v. Ridgeway, 726 F.2d 132, 135 (4th Cir. 1984), and which we review de novo, see 5 U.S.C. § 706 (the"reviewing court shall decide all relevant questions of law"). With respect to factual matters to which the contract interpretation may be applied, we review only to determine if the agency's determination was arbitrary or capricious, although even this inquiry into the facts is to be "searching and careful." See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).

Turning to the Plan language in this case, the Plan provides benefits for full-time nursing care when it is "necessary and confinement in a skilled nursing facility is medically appropriate as determined by

7

a Plan doctor." That language is straightforward. Moreover, the Plan explicitly promises for that coverage that "you pay nothing. All necessary services are covered, including: bed, board, and general nursing care." The OPM interpretation of the Plan relies on the exclusion for "custodial care, rest cures, domiciliary or convalescent care."

Of course, we must interpret the Plan as a whole and seek to harmonize all of its provisions rather than construing isolated portions of the Plan out of context. And in harmonizing the Plan's provisions, it is generally accepted that we give greater weight to specific and exact language than to more general language. See, e.g., Restatement (Second) of Contracts § 203(c).

In the case before us, we need to harmonize the provision that provides benefits for "skilled nursing care" with the clause that denies benefits for "custodial . . . or convalescent care." OPM would define "skilled nursing care" not as care requiring the skills of a trained nurse (as distinct from care provided by nonskilled personnel), but as care which is likely to result in recovery. And it would define "custodial care" as that care which is designed to assist with activities of daily living. Reading these terms together, OPM concludes that the Plan covers only care which is medically necessary to cure a patient, if a Plan doctor determines that it is medically appropriate to have such care performed by skilled nursing personnel in a skilled nursing facility. Thus, OPM reads into the coverage that skilled nursing care is afforded only when "necessary for recovery ." It maintains that the expectation of "recovery" must be read into the coverage in order to distinguish skilled nursing care from custodial care where the patient is maintained without the expectation of recovery. Concluding that Mrs. Burgin's care in the Nursing Center was designed "primarily to assist her with activities of daily living, such as hygiene and nutrition" and not with the expectation of recovery, OPM agreed that benefits should be denied.

By concluding that skilled nursing care is not covered by the Plan when it provides assistance in the activities of daily living and is covered only when recovery is anticipated, OPM seeks to redraft the contract and to eviscerate the coverage its clear language provides. Under OPM's interpretation, any care directed to the maintenance of daily living functions, regardless of the level of skill required to administer

8

it, is classified as custodial and is excluded from coverage. But the fact that skilled nursing care, or indeed acute hospital care, includes assistance in the daily activities of patients, such as feeding, bathing, and turning, does not render such skilled nursing care or even acute hospital care "custodial care"; care for activities of daily living is an inevitable adjunct to any more intensive form of care. Thus, the interpretation that any care which includes assistance in a patient's daily activities is not covered would require denial of coverage for virtually all hospital and nursing care. Such an interpretation is clearly irrational, and furthermore, it is contrary to the explicit promise of the Plan that it will provide full-time skilled nursing care when necessary and determined to be appropriate by a Plan doctor "including bed, board, and general nursing care."

OPM's broad construction of the custodial care exception and its interposition of the expectation of recovery into the skilled care coverage are further belied by the language of the Plan itself. The very clause that excludes custodial care from coverage also excludes "convalescent care." To convalesce is "to <u>recover</u> health and strength gradually after sickness or weakness." <u>Webster's Collegiate Dictionary</u> 253 (10th ed. 1993) (emphasis added). Thus, under OPM's interpretation, the exclusion of both custodial and convalescent care would appear to swallow all other coverages provided by the Plan. Nor can the limitation as to convalescent care be said to depend on the gradual nature of recovery without conflicting again with the explicit language of the skilled care coverage, which promises payment "without limit as to dollars or days" when other prerequisites for coverage are met.

We conclude that the only interpretation of the Plan language that coordinates coverage for skilled nursing care with the absence of coverage for custodial or convalescent care rests on a distinction based on the level of skill required to provide the appropriate care. Thus, if both (1) full-time care by trained nurses is "necessary" and (2) a Plan doctor determines that confinement in a "skilled nursing facility" is "medically appropriate," then coverage is provided for "all necessary services, including bed, board, and general nursing care." On the other hand, if care can be provided by personnel with training below the level of skilled nursing or if the Plan doctor does not find it medically appropriate to provide the care in a skilled nursing facility, then

9

the care may be found to be custodial or convalescent and not covered. Under this interpretation, specific coverage for skilled nursing care is not eliminated by the more general exclusion for custodial or convalescent care. See Doe v. Group Hospitalization and Medical Services, 3 F.3d 80, 88 (4th Cir. 1993) ("the exclusion should not, in the absence of clear language, be construed to withdraw coverage explicitly granted elsewhere in the contract"). Hence, we reject OPM's interpretation of the contract as violative of norms of contract construction and as otherwise arbitrary.

III

When we apply the Plan's language to Mrs. Burgin's circumstances, we can only conclude that she was entitled to benefits. All of the medical opinions in the record state that Mrs. Burgin required "skilled care" rather than "merely custodial care," and a Plan doctor, Dr. Hajjar, determined that it was medically appropriate that Mrs. Burgin be provided skilled nursing care, as was provided at the Nursing Center, thus meeting the only requirements for coverage apparent on the face of the Plan.

Moreover, even if we were to accept the OPM's interpretation of the contract, we could not sustain the OPM's decision applying that interpretation to the facts of this case. OPM would not, with its interpretation, provide coverage for skilled nursing care unless it was necessary to recovery. But there is nothing in the record to support its conclusion that the care provided to Mrs. Burgin at a skilled nursing facility was not necessary to recovery. Indeed, there is no evidence in the record regarding Mrs. Burgin's recovery prognosis, as that question was never posed to the medical professionals in soliciting their opinions about the nature of Mrs. Burgin's care requirements. Yet on this record, OPM concluded that Mrs. Burgin's treatments were not cure-oriented. Such a conclusion is unsupported and thus arbitrary.

Accordingly, we conclude that the OPM interpretation is not a reasonable one and that the facts of record do not justify a denial of coverage. Because we hold that the OPM decision denying coverage is arbitrary, constitutes an abuse of discretion, and is not in accordance with law, see 5 U.S.C. § 706(2)(a), we reverse and remand this case to the district court with instructions to direct the payment of benefits

10

for Mrs. Burgin's stay at the Nursing Center during the period of coverage by HealthPlus. See 5 C.F.R. § 890.107(c); Myers v. United States, 767 F.2d 1072 (4th Cir. 1985).

REVERSED AND REMANDED

11