**PRODUCTION MARKETING, L.L.C., Plaintiff,**

v.

**COMMODITY CREDIT CORPORATION, Defendant.**

**No. 99–A–1453–N.**

United States District Court, M.D. Alabama, Northern Division.

Aug. 8, 2000.

George W. Walker, Montgomery, AL, for plaintiff.

Randolph Neeley, Montgomery, AL, Terry Jackson, Washington, DC, Thomas Millet, Washington, DC, defendant.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This case comes before the court on a review of the Defendant Commodity Credit Corporation's ("CCC")[1] denial of payments on five applications of the Plaintiff Production Marketing, L.L.C. ("Production Marketing") under the Upland Cotton User Marketing Certificate Program ("Upland Cotton Program" or "the Program").[2] This court has jurisdiction over this case as provided by 7 U.S.C. § 6999: "A final determination of the [National Appeals] Division shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with Chapter 7 of Title 5," (the Administrative Procedure Act, 5 U.S.C. §§ 701, et seq.). This case appears to be the only appeal of its kind in the nation.

The Federal Agricultural Improvement and Reform Act of 1996, as amended ("the Act"), created the Upland Cotton Program. See 7 U.S.C. § 7236(a). The Upland Cotton Program was offered through CCC but administered by the Kansas City Commodity Office ("KCCO") of the Farm Service Agency ("FSA"), a branch of the United States Department of Agriculture ("USDA").[3] The Program provides for payments in the form of commodity certificates or cash to eligible exporters of upland cotton who have entered into an Upland Cotton Domestic User/Exporter Agreement with the CCC.

Having reviewed the administrative record, the court cannot say that the Agency's decision was arbitrary, capricious, or an abuse of discretion. Further, there is substantial evidence to support the Agency's decision. The court's analysis follows.

### II. STANDARD OF REVIEW

#### A. Parties' Arguments

The parties disagree on the standard of review that should be applied by the court.

Production Marketing argues that the court should apply a de novo standard of review to the decision because the essential question raised on appeal is a matter of contract law. See P.M. Br. at 6 (relying on Burgin v. Office of Personnel Management, 120 F.3d 494, 497–98 (4th Cir.1997) (noting "the essential question is one of the interpretation of the contract's language, a question of law clearly within the competence of courts ... and which we review de novo....")). Furthermore, Production Marketing contends that if the court must make any factual determinations, then the court should apply the arbitrary and capricious standard of review. See id. at 7.

CCC argues that de novo review is inappropriate in this case. See CCC Br. at 13. CCC alleges that Production Marketing's reliance on Burgin is misplaced, as Burgin is a case brought not under the APA, but for benefits under a health insurance plan. See id. CCC contends that de novo review under the APA is "extremely limited," and is "appropriate only where there are inadequate factfinding proceedings in an adjudicatory proceeding, or where judicial pro-

1. The United States Department of Agriculture "administers the nation's major agricultural commodity programs through a wholly-owned Government corporation called the [CCC]." See Deaf Smith County Grain Processors, Inc. v. Glickman, 162 F.3d 1206, 1207 (D.C.Cir.1998) (citing 15 U.S.C. § 714c (1994)).

2. After reviewing the administrative record and the briefs of the parties, the court determined that oral argument was not necessary in this case. Accordingly, it is hereby OR-

DERED that Production Marketing's Request for Oral Argument (Doc. # 18) is DENIED.

3. According to the Regulations, "The upland cotton user marketing certificate program ... shall be carried out in the field by FSA's Kansas City Management Office (KCMO)." 7 C.F.R. § 1427.101(a).

For purposes of this opinion, the court will use the generic term "Agency" when referring to actions taken by the CCC, KCCO, or the FSA generally.

ceedings are brought to enforce certain administrative actions." *See id.* (citing *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (citation omitted)). Further, CCC notes that "in cases where Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, [the Court] has held that consideration is to be confined to the administrative record and that no de novo proceeding may be held." *See id.* at 14 (citing *United States v. Carlo Bianchi and Co. Inc.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963)). Finally, CCC argues that this appeal does not concern a pure question of law, but rather the "appeal concerns the agency's interpretation of its regulations and the provision of its Agreement with the plaintiff." *See id.* According to CCC, the appropriate standard of review for the agency's reason and policy choices is the highly deferential "arbitrary and capricious" standard. *See id.* at 11.[4]

## B. Discussion[5]

■ It is unquestioned that this review of the Agency's action is brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq. "Under the APA, agency actions should be reversed if they are found to be 'arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Sierra Club v. Martin*, 168 F.3d 1, 3 (11th Cir.1999) (reviewing Forest Service's approval of timber sales); 5 U.S.C. § 706(2)(A). The scope of review of agency action under the APA is relatively narrow, and generally is limited to the admin-

istrative record on which the decision was made. *See Camp*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106.

The APA provides different standards of review depending on the type of decision the court is reviewing. According to the statute, a reviewing court shall:

hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of any agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706(2). The parties dispute which subsection, A, E, or F, applies to the present case.

First, the court finds that de novo review is inappropriate in the present case.[6]

*See* Order entered on March 3, 2000. Since Production Marketing argues now for a different standard, however, the court will address the arguments.

---

4. CCC argues that even under the substantial evidence standard, the agency's decision should be upheld. *See* CCC Br. at 12–13.

5. At the Rule 16 scheduling conference held in this case, the parties agreed on the appropriate standard of review, and the Rule 16 scheduling order entered thereafter provided that

"1. This case will be determined by a review of the administrative record, applying an arbitrary and capricious standard, without a trial."

6. The court also notes that Production Marketing couched its complaint in terms of the "arbitrary and capricious" standard of review and the "substantial evidence" standard of review. *See* Complaint ¶¶ 21, 22. It is only now, in its brief, that Production Marketing argues that de novo review should be used.

The Supreme Court's decision in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), makes it quite clear that de novo review is appropriate only where there are inadequate fact finding procedures in an adjudicatory proceeding, or when issues that were not before the agency are raised in a proceeding to enforce non-adjudicatory agency action. *See id.* at 415, 91 S.Ct. 814. Neither situation applies here.[7]

Second, the arbitrary and capricious standard[8] is the default standard of review in most APA cases. Thus, in order to determine whether it applies, the court must first determine if the substantial evidence test does not apply.

The court turns to the text of § 706 to determine whether the substantial evidence test applies. According to § 706, the substantial evidence test applies in cases subject to § 556 and § 557 of Title 7. Turning to these sections, § 557 applies only when a hearing is required under § 556. *See* 7 U.S.C. § 557(a) ("This section applies, according to the provisions thereof, when a hearing is required to be conducted in accordance with section 556 of this title."). Section 556 discusses the conduct of agency hearings. This section "sets forth in particular who shall preside at hearings, their powers and duties, who has the burden of proof, and the types of evidence which may or may not be received." *Taylor v. District Engineer, U.S. Army Corps of Engineers*, 567 F.2d 1332,

1335 (5th Cir.1978).[9] Section 556, however, only applies to "hearings required by section 553 or 554...." 7 U.S.C. § 556(a). Thus, the court must look to § 553 and § 554 to determine whether the substantial evidence test applies. Section 553 applies to rule making, which is not involved in the present case. Section 554 notes that "[t]his section applies ... in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing...." 7 U.S.C. § 554(a). Consequently, to determine if a § 556 hearing is required, the court must examine the statutes that are implicated in this case.

The present case revolves around 7 U.S.C. § 7236, entitled "Special marketing loan provisions for upland cotton." This statute makes no reference to any right to a hearing; however, the Program is subject to the Department of Agriculture's review statutes. *See* 7 U.S.C. §§ 6991–7000 (discussing the National Appeals Division of the Department of Agriculture). According to § 6994, a participant in a Department of Agriculture program has a right to a notice and opportunity for a hearing when the agency makes an adverse decision. *See* 7 U.S.C. § 6994. Section 6996 discusses appeals to the Division for a hearing and the time requirements for such. *See* 7 U.S.C. § 6996. Finally, § 6997 explains the general power of the Director and hearing officer over such an

---

7. The court notes, however, that *Burgin* is an APA type case, despite the protestations of CCC. The *Burgin* court does suggest that the court can use de novo review when reviewing a question of law. The court, thus, will consider any question of law without giving the same deference to the Agency's decision as it will for factual determinations.

8. The scope of review under the arbitrary and capricious standard is narrow, and the court cannot substitute its own judgment for that of the agency. Instead, the court must determine whether a rational connection exists between the facts found and the choice made. *See Atlanta Gas Light Co. v. F.E.R.C.*, 140 F.3d 1392, 1397 (11th Cir.1998). However,

agency actions are deemed to be arbitrary and capricious when the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

9. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

appeal and details the requirements for the hearing. *See* 7 U.S.C. § 6997. From these sections, the court has determined that the National Appeals Division does allow for a hearing under the Upland Cotton Program. Because it allows for this type of hearing, these proceedings are governed by § 554 and § 556 and thus, ultimately require that the court apply the substantial evidence test, under § 706(E).[10] Accordingly, the court will apply the substantial evidence standard of review when considering the administrative record in this case.

## C. Substantial Evidence Standard

As the Supreme Court has explained in the context of the APA, substantial evidence review is conducted on the record considered as a whole. *See Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *see also Greater Orlando Aviation Auth. v. F.A.A.,* 939 F.2d 954, 958 (11th Cir.1991). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera,* 340 U.S. at 477, 71 S.Ct. 456, 95 L.Ed. 456 (internal quotation marks omitted), quoted in *American Textile Mfrs. Inst. v. Donovan,* 452 U.S. 490, 522, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981); *see also F.T.C. v. Indiana Fed'n of Dentists,* 476 U.S. 447, 454, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). The reviewing court must take into account contradictory evidence in the record. *See Universal Camera,* 340 U.S. at 487–88, 71 S.Ct. 456 (The reviewing court must consider "the record in its entirety …, including the body of evidence opposed to the [agency's] view."); *see also Greater Orlando Aviation Auth.,*

939 F.2d at 958. But "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *American Textile,* 452 U.S. at 523, 101 S.Ct. 2478 (internal quotation marks omitted). The Eleventh Circuit has recently found that "[t]he substantial evidence test is no more than a recitation of the application of the 'arbitrary and capricious' standard to factual findings." *Fields v. United State Dep't of Labor Admin. Review Bd.,* 173 F.3d 811, 813 (11th Cir.1999); *see* n. 7, *supra* (discussing the arbitrary and capricious standard).

## III. FACTS

### A. Facts

#### 1. The Program

Production Marketing, an Alabama cotton broker, became a Program participant when it entered into an Upland Cotton Domestic User/Exporter Agreement ("the Agreement") with CCC, which became effective on October 1, 1998.[11] *See* R. 70–85. The Upland Cotton Program was established to help domestic cotton exporters compete in world markets. The Program paid cash or commodity certificates to Program participants based on the amount of cotton they exported and documented with the KCCO. *See* 7 U.S.C. § 7236(a).

In order to receive payment under the Program, agreement holders were required to file specific documents and forms with the KCCO. According to the Agreement, applications for payment would be processed according to the date and time

---

10. The Eighth Circuit has addressed the issue of whether an appeal to the National Appeals Division is a formal appeal, and found that the statutes "make[ ] it clear that Congress intended for NAD proceedings to be governed by 554 of the APA." *Lane v. U.S. Dep't of Agriculture,* 120 F.3d 106, 109 (8th Cir.1997). Also, it appears that a district court in Nebraska has applied the substantial evidence test to a review of a NAD hearing. *See Prokop*

*v. United States,* 91 F.Supp.2d 1301, 1308 (D.Neb.2000).

11. Production Marketing completed the Upland Cotton Domestic User/Exporter Agreement on September 2, 1998 and the Agreement was accepted by the CCC on September 17, 1998. The Agreement, however, did not become effective until October 1, 1998. *See* R. 70.

stamp the complete application was received in the KCCO. *See* R. 71. The Agreement also noted that "Form CCC–1042–2, and other required documents received by CCC that are not complete or properly identified will be returned to the Exporter for correction." R. 78.

The Program also had monetary restrictions placed on it. The Act capped Program payments for the fiscal years 1996 through 2002 at $701,000,000. *See* 7 U.S.C. § 7236(a)(4); 7 C.F.R. § 1427.100(b)(3). On August 28, 1998, the KCCO director sent a memorandum (the "Memo") to all Program participants notifying them that the funds for the Program may be depleted before 2002:

> The total expenditures for this program remains at $701 million during fiscal years 1996 through 2002. This figure may be reached before September 30, 2002. Payments will be issued on a first come first served basis and will be determined by the time stamp of the Kansas City Management Office mail room. To qualify for payment, *all* applications must be correct and accompanied with the required supporting documents. Any application submitted that is incomplete or incorrect, or does not have the necessary supporting documents will not be considered received and processed until the applicant provides the correct documentation. This may cause the payment to be forfeited if the $701 million allocation is reached before the application and/or documents are resubmitted. Program participants will be responsible for the completion and accuracy of their applications. Reporting requirements will remain the same. Exporters should submit the

required documents after the shipments have been completed and all documents have been collected.

R. 48, R. 774–75.

### 2. The Applications

In December 1998, the funds were being depleted rapidly and participants were inundating KCCO with applications. The applications were reviewed in the order received, but because of the volume, it was sometimes weeks after receipt before review. The $701 million allocation was reached on applications received before December 14, 1998, at 4:22 p.m., which were determined to be complete and correct.

Production Marketing submitted several applications for payment under the Upland Cotton Program in December of 1998. On February 2, 1999, the Agency denied payment on five of Production Marketing's applications, # 29, # 31, # 32, # 33, and # 34, refusing to pay a total of $273,676.74. Production Marketing was advised that, "Claims in excess of the appropriated $701,000,000 have been received and the Upland Cotton User Exporter Agreement was terminated on December 15, 1998. Therefore, additions or corrections to this application will not be accepted." *See* R. 87.[12]

#### a. Application 29

Production Marketing submitted application 29 for payment on December 3, 1998. *See* R. 96. The application was stamped received on December 7, 1998 and was entered into KCCO's system on December 22, 1998.[13] *See id.* This application was seeking payment for 7 different shipments, for a total of $29,145.93. *See id.*

---

**12.** Production Marketing's Application # 30 was complete when it was received and was paid in full.

Sixty-five other applications, filed by twenty-eight different applicants, were also denied payment during this same time period because the applications contained errors. Of these denied, twenty-five of the applicants

sought reconsideration of the denials. Sixteen applicants reached settlement with the CCC.

**13.** As noted above, the delayed entry date reflects the incredible volume of applications that KCCO received in December.

The FSA denied the application for payment on these shipments. According to Lester P. Bromley ("Bromley"), Chief of the Cotton Branch of the Warehouse Contract Division of the FSA:

Application 29 was rejected due to the Origin Bill of Lading which was dated *after* the truck crossed the border into Mexico. If the truck was off-loaded onto a Mexican truck the B/L would be dated prior to the crossing date. The discrepancy applied to Invoice No. FM17.

R. 87 (letter from Bromley to Poole).

*b. Application 31*

Application 31 was sent on December 7, 1998. *See* R. 101. It was dated received on December 8, 1998, and entered on December 30, 1998. *See id.* In this application Production Marketing sought payment of $60,899.89 for 14 shipments. *See id.*

Bromley stated the following reasons for the denial of the payment for these shipments:

Application 31 was not approved for payment because the application failed to show any bill of lading numbers. Also many of [Production Marketing's] supporting documents were in Spanish with handwritten dates applied. The dates were not clearly identified to what they referred to.

R. 87.

*c. Application 32*

Production Marketing sent application 32 on December 8, 1998. *See* R. 146. This application was received on December 11, 1998 and no date for entry was recorded on the CC–1045–2 form. *See id.* This application sought $59,369.68 for 12 shipments of upland cotton. *See id.*

This application was also denied by Bromley:

Application 32 was rejected for numerous reasons. Invoice number FM 28 failed to show the truck/trailer number on the bill of lading. Invoice 1009 was incorrect due to a discrepancy in the number of bales shipped. Invoice FM32 had a discrepancy in the number of pounds shown on the weight sheet versus the number of pounds on the CCC–1045–2.

R. 87.

*d. Application 33 and Application 34* [14]

Application 33 was sent on December 10, 1998 and received on December 11, 1998. *See* R. 165. The application was entered on January 14, 1999. *See id.* This application sought the payment of $59,052.12 for 10 shipments of upland cotton. *See id.*

Production Marketing sent application 34 on December 11, 1998. *See* R. 198. The application was received on December 14, 1998 and was entered on January 26, 1999. *See id.* Production Marketing was seeking $45,209.12 for 8 shipments. *See id.*

According to Bromley:

Application 33 and 34 were rejected due to supporting documents provided were in Spanish. There appeared to be discrepancy on dates the shipments crossed the border. Many border crossing documents had differing dates written on the documents that contradicted the printed dates.

R. 87.

**B. Procedural History**

*1. National Appeals Division Hearing Officer Determination*

On February 19, 1999, Production Marketing requested an administrative hearing to review the Agency's decision to deny payment on the five applications. *See* 7 U.S.C. § 6995. An administrative hearing was held on August 12, 1999, in Montgom-

**14.** The court will treat these applications together because the Agency treated them together in their denial of payment on them.

ery, Alabama, before a National Appeals Division Hearing Officer ("Hearing Officer") *See* R. 787 (Audio Tapes of Hearing). The National Appeals Division Hearing Officer reversed the Agency's finding, "[t]he Agency's decision to deny payment for [Production Marketing's] five applications was erroneous." R. 249. According to the Hearing Officer, "the Agency's decision was erroneous because they inconsistently applied the regulations." R. 247. In his findings of fact, the Hearing Officer found that a complete application was currently defined as an application that was error free and was accompanied by all the required supporting documents. R. 247 (citing testimony of Lester Bromley and Barry Klein, Agency Representatives Tape (2), Sides (1 and 2) and Tape (3), side (1), R. 787).

The Hearing Officer noted that Production Marketing submitted timely applications for payment under the Upland Cotton Program. R. 248. The Hearing Officer then found that because the Program was nearing the statutory cap, the Agency instituted a procedure to accommodate the incoming applications. "In modifying the application procedure, the Agency did not immediately notify exporters who submitted incomplete applications." R. 248. "Previously, the Agency allowed [Production Marketing] and others submitting applications that were incomplete an opportunity to provide the missing information." R. 248. Thus, the Hearing Officer concluded, "The Agency deviated from the customary procedures by redefining what constituted a complete application." R. 248.

Relying on 7 C.F.R. §§ 1427.101(b), 1427.101(e), and 1427.108(d), the Hearing Officer held that the "Agency's decision to deny payment for the [Production Marketing's] five applications was erroneous." R. 249.

## 2. Director's Appeals Determination

On September 22, 1999, the Agency filed a Request for Director's Review of Production Marketing's appeal to the Hearing Officer. *See* 7 U.S.C. § 6998. On October 7, 1999, the Director reversed the decision of the National Appeals Division Hearing Officer. *See* R. 738. According to the Director, "Substantial evidence does not support the Hearing Officer's determination that the Agency erred in denying [Production Marketing's] request for payment in full." *See* R. 741. Further, the Director found that "[t]he Hearing Officer's determination is not consistent with the laws and regulations of the Agency and with the generally applicable interpretation of such laws and regulations. . . ." R. 740.

In his review, the Director noted evidence that "[a]ny application submitted that was incomplete or incorrect, or did not have the necessary supporting documents would not be considered received and processed until the applicant provided the correct documentation." R. 739. Further, the Director found that a "complete application is defined as an application that is error free and accompanied by all required supporting documents." R. 739. Relying on 7 U.S.C. § 6997(c)(4),[15] the Director concluded that Production Marketing "has not proved error in the denial of the total claims submitted, as it was determined that the applications were incomplete on their face and [Production Marketing] was notified of program funding limitations." R. 741. Ultimately, the Director reversed the Hearing Officer's determination.

On October 24, 1999, Production Marketing requested a reconsideration of the Director's decision. *See* R. 733. On November 2, 1999, Norman Cooper, Director of the USDA National Appeals Division, notified Production Marketing by letter that its request for reconsideration was denied. *See* R. 732.

---

**15.** This statute provides, "The appellant shall bear the burden of proving that the adverse decision of the agency was erroneous." 7 U.S.C. § 6997(c)(4).

Production Marketing filed this lawsuit on December 9, 1999 and amended the Complaint on February 22, 2000, seeking judicial review of the Agency's final determination, in accordance with 7 U.S.C. § 6999. *See* Amended Complaint.

## IV. DISCUSSION

The Agency argues that the five applications filed by Production Marketing were denied because they were not complete or correct and were, therefore, properly rejected for payment by the Agency as not proper under the Program's regulations and the Agreement. *See* CCC Br. at 17–18. Because the Agency's decision to deny the applications was based on proper authority, the Agency contends that the decision was not arbitrary and capricious, nor was it an abuse of discretion and it was supported by substantial evidence. *See id.* at 18.

Production Marketing argues in response that the Agency acted arbitrarily and capriciously in denying the applications. Production Marketing's arguments fall into roughly three categories: (1) that reliance by the Agency on the Memo issued on August 28, 1998 and referred to in the Facts section of this Opinion, was improper reliance on parol evidence; (2) that the Director of the KCCO acted outside of his authority in modifying or waiving provisions of the regulations and the Agreement; and (3) that the Agency acted arbitrarily and capriciously by relying on hyper-technicalities.

In reviewing the Agency's decision under the substantial evidence standard of review, the court will address each of Production Marketing's arguments in turn.

### A. Parol Evidence

Production Marketing argues that the Memo is barred by the parol evidence rule and should not have been relied on by the Agency. The Memo was dated August 28, 1998, whereas Production Marketing entered into the Agreement on September 2, 1998. Production Marketing claims that the Memo is parol evidence because the Agreement speaks to the issue of how payments will be made. The Agreement provides that applications and supporting documents must be submitted "[w]ithin 60 calendar days after the date of export...." R. 79. The Agreement further states that "required documents received by CCC that are not completed or properly identified will be returned for correction." R. 78. The Memo stated that "all applications must be correct and accompanied with the required supporting documents." R. 47. Production Marketing contends that because the Agreement is clear and unambiguous[16] and addresses the issues covered by the Memo, the Agreement should be controlling on the issue of payments. *See* PM Br. at 89 (citing *Moore v. Pennsylvania Castle Energy Corp.*, 89 F.3d 791, 796 (11th Cir. 1996) ("The parol evidence rule is based upon the idea that a completely integrated writing, executed by the parties, contains all of the stipulations, engagements, and promises that the parties intended to make, and that all of the previous negotiations, conversations, and parol agreements are merged into the terms of the instrument.") & *John F. Harkins Co. v. Waldinger Corp.*, 796 F.2d 657, 666 n. 4 (3d Cir.1986) (Garth, J. dissenting) (finding that because the contract is clear on its face, outside evidence of intent "to the extent that it contradicts the express language of the contract, should be immaterial and inadmissible under the parol evidence rule")). Consequently, Production Marketing argues that under the terms of the Agreement, the Agency was contractually obligated to return its applications for correction and to give Production Marketing 60 days from the date of export of the upland cotton to correct the applications

---

**16.** Production Marketing argues that the clear nature of the Agreement is illustrated by CCC's prior course of dealing, returning in-complete applications to Production Marketing for correction. *See* PM Br. at 10 n. 6 (citing R. 16, R. 829 & R. 90).

for the cotton shipment. *See* PM Br. at 8. Production Marketing contends that the Agency's behavior in denying the payments to Production Marketing, relying on the Memo for support, "constitutes the essence of arbitrary and capricious agency action." *See id.* at 11 (citing *Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir.1978) (noting that when the "Commission would have the power to adopt either of two different approaches to deciding these cases, it cannot adopt one and apply the other. To do so is the essence of arbitrary and capricious action.")).

The Agency alleges that the Memo was only a notice to Program participants of the existing requirements of the Program. First, according to CCC, the Memo confirms the limited availability of Program funds. *See* CCC Br. at 21 (citing 48, 773). The Memo reiterated the statutory cap of $701,000,000 for the fiscal years 1996 through 2002. *See* 7 U.S.C. § 7236(a)(4). Second, the Agency argues that the Memo confirms Section A–1(b) of the Agreement, stating that payments under the program are made on a first come, first served basis. *See id.* (citing R. 71). Third, according to the Agency, the Memo conforms to 7 C.F.R § 1427.101(f), 7 C.F.R § 1427.105(a) and Sections A–1(b) and C–5(a)(1) of the Agreement requiring the Program participants to be responsible for the completion and accuracy of their applications. *See id.* (citing R. 71, R. 48, & R. 773). Next, the Agency contends that the Memo merely states the obvious that after the $701 million cap is reached, no funds would be paid out under the Program. *See id.* at 22. Finally, the Agency argues that the Memo makes it very clear that nothing in the Program has been changed:

"Reporting requirements will remain the same." *See id.* (citing R. 774).[17]

The parol evidence rule bars the admissibility of prior or contemporaneous statements which contradict a fully or partially integrated agreement. *See* Restatement (Second) of Contracts § 215; *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1308 (11th Cir.1998). An agreement is fully integrated if it is "intended by the parties to be a complete expression of their agreement;" parol evidence may not be introduced when such an agreement exists. *See Calder v. Camp Grove State Bank*, 892 F.2d 629, 632 (7th Cir.1990); *Walley v. Bay Petroleum Corp.*, 312 F.2d 540, 543–44 (5th Cir.1963). A partially integrated writing may be supplemented, but not contradicted, by extrinsic evidence of prior or contemporaneous statements.

The Memo that the Agency relied on, in part, to deny the applications of Production Marketing does not constitute impermissible parol evidence. First, neither the Agreement nor the regulations are clear as to what constitutes a complete or correct application. *See* discussion, *infra*, at section IV.B.1 (discussing definitions). Thus, the Memo could be considered evidence that is used to explain and interpret the Agreement and the regulations. Second, the Memo does not appear to contradict an express term of the Agreement. The Memo does state that in order to qualify for payment an application must be "correct and accompanied with the required supporting documents." R. 774. The Agreement says that applications will be processed when "the complete application package is received" by KCCO.

---

**17.** The Agency also alleges that Production Marketing was fully aware of the Memo, when it signed the Agreement. *See* CCC Br. at 23. Thus, it knew that incomplete and inaccurate applications would not be processed. *See id.* The Agency contends that to permit Production Marketing to correct its applications and relate the applications back to the original filing date would not only contravene the regulations of the Program and the Agreement, but would encourage participants to carelessly and without due diligence file incomplete and incorrect applications, to the grave prejudice of participants who timely filed correct and complete applications for payment from limited, discrete funds. *See id.*

R. 71. There is no indication in either the Memo or the Agreement that the difference between complete and correct is contradictory. Next, there is no indication that the Agreement is fully integrated, as there is no merger clause in the document. In fact, the Agreement specifically incorporates by reference other documents into it, including several Federal Regulations. Thus, the Agreement itself is not the only controlling document. Finally, the court notes that Production Marketing knew of the Memo before it signed the Agreement, and thus, understood its conditions. Accordingly, the court finds that the Memo is not barred by the parole evidence rule and that there is substantial evidence to support the Agency's reliance on the Memo.[18]

**B. Abuse of Authority**

Production Marketing argues that the Director of the KCCO, who authored the Memo, was "expressly without authority to add to or modify the requirements for payment under the Program." *See id.* at 11; *see also* PM Reply Br. at 6. More specifically, Production Marketing contends that KCCO used the Memo to make two changes to the Program. First, Production Marketing contends that the Agency used the Memo to change the Program's definition of a complete application. Second, according to Production Marketing, CCC relied on the Memo to change its operating procedures by not returning applications that needed additional information or needed to be corrected after they had been received. It is this Memo that Production Marketing alleges KCCO had no right to issue or to rely on. Accordingly, Production Marketing argues that upholding the Memo constitutes an arbitrary and capricious action. *See* PM Br. at 12 (citing *Pace Co., Div. of Ambac Indus., Inc. v. Dept. of Army*, 344 F.Supp. 787, 790 (W.D.Tenn.1971), *Arlington Hosp. v. Schweiker*, 547 F.Supp. 670, 680 (E.D.Va. 1982), rev'd on other grounds, 731 F.2d 171

(4th Cir.1984) & *First Am. Bank v. Resolution Trust Corp.*, 30 F.3d 644, 649 (5th Cir.1994)).

**1. Complete v. Correct**

Production Marketing contends that whether the applications met the requirements for payment under the Program when they were submitted is really the focus of this case. *See* PM Reply Br. at 3. The Regulations stated that "[p]ayments in accordance with this subpart shall be made available to eligible domestic ... exporters who have entered into an ... Agreement with CCC and who have complied with the terms and conditions set forth in this subpart, ... [the] Agreement and instructions issued by CCC." 7 C.F.R. § 1427.105(a). The Agreements states that "[a]pplications for payment will be processed according to the date and time stamp the complete application package is received in the Kansas City Commodity Office (KCCO)." R. 71. According to Production Marketing, neither the Agreement nor the regulations require that each application they submitted be error free. *See* PM Reply Br. at 4. Production Marketing contends that the Hearing Officer "manufactured" the definition of complete, finding as a fact that "[a] complete application is currently defined as an application that is error free and accompanied by all required supporting documents. Any application that is incomplete or incorrect is not considered as received until all of the correct documents are provided." R. 247 (Appeal Determination of Hearing Officer); *see also* R. 739 (Director Review Determination). Production Marketing argues that the Hearing Officer came to this definition from "statements made by CCC representatives" and from the language of the Memo. *See* PM Reply Br. at 5 (citing R. 247, R. 773–74). Thus, Production Marketing contends that the determination of

---

**18.** Even if the Memo were considered parol evidence which could not be relied upon, the Agency's decision is properly supported by the terms of the Agreement and the Program regulations themselves. *See* discussion, *infra,* IV. B & D.

this definition illustrates the arbitrary and capricious nature of the Agency's decision.

The Regulations specifically prohibit KCCO from modifying or waiving any of the provision of the regulations of the Upland Cotton Program. *See* 7 C.F.R. § 1427.101(b) (representatives of KCCO "do not have the authority to modify or waive any of the provisions of the regulations. . . ."). Production Marketing claims that the Memo modified the provisions of the Program by redefining what was required in a complete application. Upon review of the record, however, the court concludes that the Agency's interpretation that incorrect applications were not considered complete applications is supported by substantial evidence in the terms of the Agreement and the regulations.

An analysis of the use of the terms "complete" and "incorrect" in the Agreement and in the regulation indicate that an incorrect application, one that was missing documents or had documentation errors, was always considered an incomplete application, one that was not ready for submission to the KCCO. Section A–1 of the Agreement states that "[a]pplications for payment will be processed according to the date and time stamp the *complete* application package is received in the Kansas City Commodity Office (KCCO)." R. 71, Agreement A–1(b) (emphasis added). Although, the Agreement does not explicitly define what a "complete" application is, the Agreement does specify what documents are needed to accompany an application: Form CCC–1045–2; a copy of the bill of lading; weight sheets; a copy of the export sale invoice. *See* R. 78–79, Agreement C–5. The terms of the Agreement also specifically detail the information these documents must contain. For example, for cotton exported to Mexico, which is the case here, the "bill of lading must include the date of shipment, car or truck number, bales in pound exported for each type of cotton, origin shipping location and

destination. Documentation evidencing the date the shipment crossed the border issued by an acceptable independent third party acceptable to CCC will be required on these shipments." R. 78, Agreement C–5(a)(3).

Section C–5 of the Agreement further instructs the exporters:

> (1) Form CCC–1045–2, Upland Cotton User Marketing Certificate Program Exporter Application for Payment (Exhibit 3), shall be prepared for all positive pay shipments based on the date of export. . . . Form CCC–1045–2, and other required documents received by CCC that are not *complete* or properly identified will be returned to the Exporter for correction.

R. 78 (emphasis added). Thus, under the terms of the Agreement, it was KCCO's policy to return Applications that were missing any of the information that was required under Section C–5 of the Agreement or where information was not properly identified.

Three provisions in the regulations also are important.[19] First, the regulations indicate that "[p]ayments . . . shall be made available upon application for payment and submission of supporting documentation, including proof of purchase and consumption of eligible cotton by the domestic user or proof of export of eligible cotton by an exporter, as required by the provisions of the [Agreement] issued by CCC." 7 C.F.R. § 1427.108(d). Second, the regulations state, "Payment applications . . . not executed in accordance with the terms and conditions determined and announced by CCC . . . shall be null and void." 7 C.F.R. § 1427.101(f). Finally, 7 C.F.R. § 1427.105(a) notes that "[p]ayments . . . shall be made available to eligible domestic users and exporters who have entered into an [Agreement] with CCC and who have complied with the terms and conditions set forth in this subpart, the [Agreement] and

---

**19.** The Agreement explicitly incorporates the regulations found in 7 C.F.R. § 780 et seq., 7 C.F.R. § 1401 et seq., and 7 C.F.R. § 1427 et seq. *See* R. 73, Agreement A–9.

instructions issued by CCC." Therefore, in order to receive payment, exporters had to submit to KCCO all the required documents under the Agreement. KCCO was bound to follow these regulations.

The Memo noted that "[a]ny application submitted that is *incomplete* or *incorrect,* or does not have the necessary supporting documents will not be considered received and processed until the applicant provides the correct documentation." R. 48 (emphasis added). Although the Memo added the word "incorrect," the Memo did not alter what documents were necessary in order to receive payment nor did it alter KCCO's policy of what documents it considered complete. The Agency had established a practice of returning applications that were missing information, information that Production Marketing is now calling "hyper-technicalities," to be resubmitted when the information was gathered. The Director determined that the applications in the present case were missing such information. Consequently, substantial evidence, in the form of the regulations and the terms of the Agreement, supports the Agency's determination not to pay Production Marketing on these applications.

Further, the determination that the Memo did not change the definition of complete is supported by the reasoning of the Director and the Hearing Officer, despite the Hearing Officer's final determination. The Hearing Officer came to the conclusion, and the Director agreed, that a complete application was one that was "error free and accompanied by all required supporting documents." R. 739 (citing Hearing Officers Findings of Fact 6 and 7, R. 247).[20] In accordance with the Agreement and the regulations, the Hearing Officer found that "[a]ny application that is incomplete or incorrect is not considered as received until all of the correct documents are provided." R. 247. Finally, the Hearing Officer found, and again the Director agreed, that Production Marketing's applications that were denied were not complete when they were submitted to KCCO. *See* R. 741. From these findings, all supported by substantial evidence in the record, the Director concluded that Production Marketing's "five application were incomplete as of [the date the money ran out] and, therefore, did not qualify for payment." R. 741.

Production Marketing was responsible for submitting complete applications with supporting documentation before payment could be made and they did not comply with this requirement.[21] Accordingly, the Agency's conduct is supported by substantial evidence in the record. The record does not support the theory that the Agency used the Memo to manufacture a new definition of complete, in order to deny payment on some applications.

### 2. *Failure to return*

■ The Agency argues that it would have been physically impossible for Production Marketing to file corrected submissions before the Program cap had been reached. *See* CCC Br. at 25. Funds for the Program ran out on December 14, 1998 at 4:22 p.m. *See* R. 247. The provision of the Agreement that allowed for the return of incomplete applications, C–5(a)(1), became inoperative when the funds for the Program ran out. *See* CCC Br. at 26. According to the Agency, to permit Production Marketing to relate its applications, once corrected, to the original date of filing would "be in plain contravention of the procedures established by the regulations and Agreement authorizing payment

---

**20.** It appears from the record that this fact was based on the testimony of Lester Bromley and Barry Klein, Agency Representatives at the Appeals Hearing.

**21.** The Hearing Officer noted that the "Agency did not immediately notify exporters who

submitted *incomplete* applications. Those applications were passed over in favor of *complete* applications that were filed late in the order of processing." R. 248 (emphasis added).

on a first in, first served basis. . . ." *See id.* at 27. Thus, the Agency avers that not paying Production Marketing for the applications was "proper and reasonable, was supported by substantial evidence, and was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See id.* at 29.

The only evidence in the record that suggests that the Memo changed the Program is that the five applications were never returned for correction. The administrative record indicates, and the Agency points out, however, that this is not because the Program terms were changed by KCCO, but rather because the Program ran out of funds before the applications could be returned. Prior to December of 1998, the KCCO would return applications to exporters within a day or two of receipt if there needed to be additional information with the application. In fact, previous applications had been returned by KCCO to Production Marketing for clarification or for additional information. *See* PM Br. at 9 n. 4 (noting that previous applications had been returned and corrected). There is nothing in the Agreement or the regulations, however, that prescribed within how many days such applications needed to be returned by the KCCO. The Agreement merely stated, "Form CCC–1045–2, and other required documents received by CCC that are not complete or properly identified will be returned to the Exporter for correction." R. 78 (Agreement C–5(a)(1)).

In December of 1998, the KCCO was so inundated with applications, receiving over 1,100 applications during the first eleven business days of December, that KCCO could not possibly review each application within a day of receipt and notify the exporters of changes that needed to be made. *See* R. 787 (tapes, discussing the chaos at the KCCO with exporters lining up to turn in applications in December of 1998). Thus, by the time Production Marketing's applications were reviewed and it was determined that they were incomplete

or incorrect, the cap for the Program had been reached. The Agreement itself says that the Agreement terminated when the funds for the Program were depleted. *See* R. 74 (Agreement A–11). Consequently, by not returning the applications, KCCO was not modifying or waiving any of the provisions of the regulations governing the program, as prohibited by 7 C.F.R. § 1427.101(b). Rather, the KCCO was upholding the requirements of the Program, specifically part C–5(a) of the Agreement. The only alteration that KCCO made was a forced change in how fast it could review the applications, and this was not proscribed by the regulations.

Moreover, the court agrees with Production Marketing that allowing exporters to resubmit their applications is a term of the Agreement. The court disagrees, however, that the processing of all other applications should have been held up, as would have been required had KCCO operated as Production Marketing would have liked them to, while Production Marketing corrected its applications. There is no indication in the record that in the past other applications were not processed and paid out between the time that Production Marketing filed its original application and the time that Production Marketing filed any supporting documents that were asked for by the KCCO to correct the application. If anything, the record indicates that other applications were taken and logged in before corrected applications were resubmitted. *See* R. 705–26 (indicating some re-filed corrected applications). Thus, the court concludes that there is substantial evidence in the record to affirm the Director's determination that KCCO did not modify or change the Agreement terms. Consequently, the Agency's denial of payments is supported by the terms of the Program.

## C. Reliance on "Hyper–Technicalities"

■ Production Marketing explains that it was able to correct all of the "discrepancies" in the applications identified by the

Agency and that by relying on "hyper-technical deficiencies and discrepancies" to deny payment on applications, the Agency "clearly demonstrates the arbitrary and capricious nature of its actions." *See id.* at 13.[22]

For example, in application # 29, the date on the bill of lading for one of the seven shipments was dated three days later than the date the forwarder's documents showed that the cotton crossed the Mexican border. *See id.* at 14 (citing R. 97 & R. 98). According to Production Marketing, these dates had nothing to do with payment rate. Another example that Production Marketing gives relates to application # 31. In application # 31, the bill of lading numbers were missing from the application, see R. 87, some of the documents were in Spanish, see R. 42, and some of the documents had handwritten dates, see R. 87. Production Marketing contends that the bill of lading numbers were clearly marked in the supporting documents, that the Program participants had been told that it was acceptable to use a Mexican Impedimento de Importation, see R. 808, and that there was never a requirement in the Agreement or statutes and regulations that all dates be typed on the forwarding documents. *See* PM Br. at 15.

Application # 32 was incomplete for three deficiencies. *See* R. 87. First, one of the invoices failed to show the truck number on the bill of lading. *See id.* This number, according to Production Marketing, has no impact on the amount of cotton shipped or the payment that was sought. *See* PM Br. at 15. Another reason CCC denied the application was because there was a discrepancy of the number of bales listed on the export shipment. CCC argues that this number is irrelevant, however, as payment for the Program is done

based on net weight of the cotton shipped. *See* PM Br. at 16. The third reason that CCC denied application # 32 was that there was a discrepancy in the weight of the cotton listed for one of the shipments. The weight listed on the application was 43,673 lbs, which was supported by the bill of lading. *See* R. 145. On another supporting document the weight for this shipment was listed as 44,146 lbs. *See id.* Production Marketing argues that the only person who was injured by the difference in weight was Production Marketing, who listed the lesser of the weights on its application for payment. *See* PM Br. at 16.

As for application # 33, there was a discrepancy between the handwritten date on the forwarder's document and typewritten date on that same document. *See* PM Br. at 17 (citing R. 164, R. 169, R. 172, & R. 193). Production Marketing argued that the differences in the dates were because one date was the date the Impedimento would be issued, while the other date, was the actual date the cotton crossed the border—the difference usually was because of a backlog at the Mexican border. *See id.* Further, Production Marketing contends that both sets of dates were in the same payment week, thus, either date would have resulted in the same payment under the Program. *See id.*

Lastly, application # 34 was denied for the same reasons that application # 33 was denied. In this instance, Production Marketing contends that although the date differences between the handwritten dates and the typed dates fell into two different payment periods, Production Marketing put the date that would lead to the lesser payment under the Program on the application.[23] *See* PM Br. at 18. These hyper-

---

**22.** Production Marketing argues that by using the Memo to deny certain claims, CCC was able to come within one cent of the Program cap. *See* PM Br. at 12 (citing R. 820 & R. 832). According to Production Marketing, 27 other Program participants were denied money because of "hyper-technicalities" also.

**23.** The payment rate for cotton exported on December 10 was .1324. *See* R. 165. The payment rate for cotton exported on December 11 was .1258. *See* R. 198. Production Marketing put December 11 as the export date on its application.

technicalities that led to the denial of the applications, Production Marketing argues, illustrate the arbitrary and capricious nature that CCC used in denying the payments.

The Agency argues that Production Marketing has admitted that the five applications in dispute needed additional information when they were filed. The Agency points to a letter requesting review where Production Marketing wrote, "We do not dispute the facts that Mr. Bromley has outlined in his letter." *Id.* at 24 (citing 90–91).[24] The Agency argues that although Production Marketing has explained the discrepancies in its applications, Production Marketing did not make any explanations when it filed the applications originally. *See id.* According to the Agency, if the corrections could have been readily made, they should have been done correctly before the applications were submitted. *See id.* Even if the errors were "hyper-technical," the Agency argues that it had a policy of treating all errors alike. *See id.* at 25 (citing R. 78, Agreement C–5(a)(1)).

Production Marketing's arguments that certain information that KCCO stated was incorrect and needed to be corrected was a "hyper-technicality" and, thus, irrelevant to the actual payment of the funds, is incorrect. For example, Production Marketing argues that the fact that Application # 32 failed to show a truck number had no impact on the amount of cotton shipped or the payment that was sought on that application. Although this information may not have affected the amount of payment under the Program for which Production Marketing was eligible, the truck number is a required piece of information according to the Agreement. *See* R. 78 (Agreement C–5(a)(3)). Thus, if KCCO paid Production Marketing on this

application without this number, KCCO would have essentially waived a requirement of the Program. As another example, Production Marketing argues that in application # 32 there was a discrepancy in the number of bales listed on the application, but that this did not matter as the funds under the Program were paid out based on the weight of the cotton exported not the number of bales exported. Again, though, the Agreement specifically requires that the number of bales be listed on the application. *See* R. 78 (Agreement C–5(a)(2)).

Applications 29, 31, 33 and 34 all were denied, at least in part, because the documentation submitted by Production Marketing had handwritten dates on it that were not identified as to what they related to. The Agreement states that documents that are not "properly identified" would be returned to the exporter for correction. *See* R. 78 (Agreement C–5(a)(1)). Thus, the denial of these payments is supported by the terms of the Agreement.

So, KCCO would have waived some of the Agreement requirements if it had paid out on the applications submitted by Production Marketing. Apparently, Production Marketing would like to "have it both ways." It argues that KCCO was altering the Program requirements when it did not return the applications, but it wants KCCO to overlook specific Program requirements for what needs to be listed on the applications, on the basis that requiring strict compliance would amount to imposing "hyper-technicalities." Had the Agency acted as Production Marketing would have liked them to, the Agency's behavior would have been "arbitrary and capricious" and unsupported by substantial evidence. It is the application of the Program requirements

---

**24.** Production Marketing challenges the Agency's interpretation of this sentence:

> Production Marketing in fact does not dispute the *facts* stated in Mr. Bromely's letter, for example, that many of the supporting documents submitted in support of Application 32 were in Spanish and had handwrit-

ten dates on them. What Production Marketing does dispute is Mr. Bromley and the CCC's conclusion that the facts set forth in his letter renders all the applications *incomplete* or *incorrect*.

PM Reply Br. at 2 n. 2.

which was actually made by the Agency which is supported by substantial evidence.

## V. CONCLUSION

For the foregoing reasons, the court finds that the Director's decision to affirm the Agency's denial of payment on Production Marketing's Applications 29, 31, 32, 33, and 34 under the Program is supported by substantial evidence. Accordingly, the final determination of the Director is due to be affirmed, and a separate Order and Judgment will be entered in accordance with this Memorandum Opinion.