FILED
United States Court of Appeals
Tenth Circuit

August 23, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

WEIGHT LOSS HEALTHCARE
CENTERS OF AMERICA, INC.,

Plaintiff - Appellant,

v.

OFFICE OF PERSONNEL
MANAGEMENT,

Defendant - Appellee.

No. 10-3247

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 2:09-CV-02498-CM-JPO)**

Daniel D. Owen of Shughart, Thomson & Kilroy (P. John Brady, Andrew J.
Ennis, and Anthony W. Bonuchi of Polsinelli Shughart, PC, on the briefs), Kansas
City, Missouri, for Plaintiff - Appellant.

David B. Bailey, Assistant United States Attorney, (Barry P. Grissom, United
States Attorney, and Jackie A. Rapstine, Assistant United States Attorney, on the
brief), Topeka, Kansas, for Defendant - Appellee.

Before **HARTZ**, **MCKAY**, and **EBEL**, Circuit Judges.

**HARTZ**, Circuit Judge.

Eric Walters was a federal employee covered by a Standard Option health insurance plan (the Plan) administered by Blue Cross Blue Shield of Kansas City (Blue Cross). In November 2007 he went to Weight Loss Healthcare Centers of America, Inc. (Weight Loss) to inquire about surgical treatment for obesity. Because Weight Loss had no contractual arrangement with Blue Cross as either a preferred provider or a participating provider, Walters would expect to pay more than if he used a provider that had a contract. Nevertheless, the following February Walters had outpatient laparoscopic surgery at Weight Loss to insert an adjustable gastric band (lap band) that would help him better control his weight. Although Walters obtained preauthorization from Blue Cross for the surgery, there is no indication in the record that he requested or received information about his out-of-pocket costs.

Weight Loss billed Blue Cross $56,000 for the procedure. The bill included various codes (which are not explained in the record) and two charges: one for "gastric lap band," with a "unit price" of $50,000; and one for "lap band ap low prof," with a unit price of $6,000. Aplt. App. at 71. There was no separate charge for the services of surgeons or anesthesia providers. Blue Cross paid only $1,610. Its Explanation of Benefits (EOB) sent to Walters stated that there was a payment of $1,610 for "surgery" and no reimbursement for the "medical equip/supply" charge of $6,000. *Id.* at 72. The Blue Cross Plan paid non-participating facilities 70% of the Plan allowance for outpatient surgery, and

the EOB said that the allowance was $2,300. Walters was responsible for the remaining $54,390 billed by Weight Loss.

Weight Loss, having obtained permission from Walters to act on his behalf, requested that Blue Cross reconsider its payment, but the insurance company responded that it had correctly calculated Walters's benefits. Weight Loss appealed to the federal Office of Personnel Management (OPM), which held that Blue Cross's interpretation of Walters's Plan was correct and it had paid the proper amount.

Weight Loss, again acting on behalf of Walters, then brought suit in the United States District Court for the District of Kansas, asking that the court order OPM to require Blue Cross "to pay the amount of benefits in dispute" and "to provide specific and detailed reasons for the partial denial of the benefits." *Id.* at 14. The district court affirmed OPM's decision.

Weight Loss appeals, raising three issues. First, it argues that the district court erred by deferring to OPM's interpretation of the Plan. Second, it argues that OPM and the court incorrectly interpreted the Plan. Third, Weight Loss argues that OPM never obtained the calculations and data that Blue Cross used to determine the amount of the plan allowance for outpatient surgery, making a reasoned decision impossible.

We have jurisdiction under 28 U.S.C. § 1291. We hold that OPM's interpretation of the Plan is entitled to deference because of its intimate and

-3-

extensive involvement in the negotiation and interpretation of federal health-insurance plans. We further determine that OPM reasonably interpreted the Plan language. We reverse the district court's decision, however, because OPM neither (1) reviewed the evidence that would show whether Blue Cross had correctly calculated the Plan allowance, nor (2) explained why such review was unnecessary.

## I.    DISCUSSION

### A.    Standard of Review/Deference to OPM

"When reviewing agency action, we accord no deference to the district court's decision. Rather, we apply the same standard of review to the administrative record as [should] the district court." *Lee v. U.S. Air Force*, 354 F.3d 1229, 1236 (10th Cir. 2004) (brackets, citations, and internal quotation marks omitted).

Weight Loss argues that we should review OPM's interpretation of the Plan de novo. It acknowledges that "[c]ourts are right to defer . . . to OPM's factual findings, its compilation of the record, and its interpretation of regulatory requirements" but contends that here OPM merely interpreted an insurance contract, a task that courts frequently perform and for which OPM had no specialized expertise. Aplt. Br. at 19. We disagree.

Although an agency's interpretation of a contract is generally not entitled to deference, such deference may be appropriate in certain circumstances. *See*

*Sternberg v. Sec'y*, *Dep't of Health & Human Servs.* (HHS), 299 F.3d 1201, 1205 (10th Cir. 2002); *cf. Tex. Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 270 (1960) (when agency interprets contract using standard legal analysis and not its expertise, review is de novo).  We have previously recognized the following as factors that can indicate the propriety of deferring to an agency's interpretation under an arbitrary-and-capricious standard of review:   (1) the agency routinely reviews such contracts, (2) review of such contracts is a duty delegated to the agency by Congress, and (3) the contract deals with arcane subject matter or uses specialized terminology with which the agency is familiar.  *See Sternberg*, 299 F.3d at 1205–06 (refusing to defer to HHS interpretation of a sentencing agreement in a criminal case because HHS did not routinely review sentencing agreements, such review was not a duty delegated to HHS by Congress, and the agreement did not concern arcane subject matter); *see also Nw. Pipeline Corp. v. Fed. Energy Regulatory Comm'n* (FERC), 61 F.3d 1479, 1486 (10th Cir. 1995) (deferring to FERC interpretation of natural-gas tariff filed by pipeline company because Congress had delegated broad authority over natural-gas rates to FERC and it had vast experience in reviewing the tariffs).  In addition, when a contract affects numerous persons throughout the country, fairness and efficiency may suggest the advisability of a central decisionmaker to resolve ambiguities.  *See Muratore v. OPM*, 222 F.3d 918, 923 (11th Cir. 2000) ("OPM has the ability to

-5-

take a broad, national view when it interprets plans which serves the function of ensuring consistent, nationwide application.").

Whether to defer to OPM's interpretation of a federal-employee insurance plan is a matter of first impression in this circuit. We begin our analysis by describing the role of OPM. OPM is responsible for "executing, administering and enforcing . . . the civil service rules and regulations of the President and [OPM] and the laws governing the civil service." 5 U.S.C. § 1103(a)(5)(A). It has authority to administer and regulate many aspects of federal employment, including pay rates, *see id.* § 5338, hours of work, *see id.* § 6101(c), annual and sick leave, *see id.* § 6311, and life-insurance benefits, *see id..* § 8716.

Of particular relevance to this appeal are OPM's duties under the Federal Employees Health Benefits Act of 1959 (FEHBA), 5 U.S.C. §§ 8901–14, which governs health benefits for federal employees. Under the Act, OPM may enter into contracts with health-insurance carriers to provide coverage for federal employees. *See id.* § 8902(a). It can prescribe minimum standards for health-insurance plans, *see id.* § 8902(e); it determines whether rates charged by the plans "reasonably and equitably reflect the cost of the benefits provided," *id.* § 8902(i); and it is responsible for providing information to federal employees about available insurance plans and for continually studying their operation, s*ee id.* §§ 8907, 8910. And each contract must require the carrier to pay for or provide services if OPM finds that the employee is so entitled. *See id.* § 8902(j).

The FEHBA authorizes OPM to promulgate regulations to carry out its provisions. *See id.* § 8913(a). OPM regulations set minimum standards for health insurers, *see* 5 C.F.R. § 890.202, and permit OPM to withdraw approval of any health-insurance plan that is not meeting its standards, *see id.* § 890.204. They authorize OPM to negotiate benefit and premium changes with health-insurance carriers, s*ee id.* § 890.203(b); and they permit approval of plans only if they are "in the best interest of enrollees," *id.* § 890.203(a)(3). Any federal employee who disputes a decision by an insurance provider must pursue relief from OPM before seeking judicial review. *See id.* §§ 890.105(a)(1), 890.107(d)(1). Judicial review is by suit against OPM. *See id.* § 890.107(c).

The statutory obligation of OPM to understand federal employee health plans comprehensively is apparent from the above-mentioned duties to negotiate, evaluate, and study contracts, and to resolve disputes between insureds and insurance carriers. Thus, two of the *Sternberg* factors argue for deference: OPM routinely reviews health-care insurance plans, and it is mandated by Congress to do so.

Further, not only are the advantages of a uniform, nationwide interpretation of these plans manifest, but the legislative history of FEHBA shows that Congress was motivated by those advantages when it adopted 5 U.S.C. § 8902(m)(1), which preempts the application of state law to the federal plans. Indeed the title of the law adding § 8902(m)(1) to the FEHBA is "An Act to Amend [the FEHBA] *to*

*establish uniformity in Federal employee health benefits and coverage* by preempting certain State or local laws which are inconsistent with such contracts, and for other purposes." Pub. L. No. 95-368, 92 Stat. 606 (1978) (emphasis added). *See also* H.R. Rep. No. 95-282, at 4 (1977) ("In view of the doubt and confusion that exists among the health benefits carriers and many States . . . and the necessity and desirability of providing uniform coverage for all enrollees in each option of each plan, the committee strongly recommends enactment of [§ 8902(m)]."); *Nesseim v. Mail Handlers Benefit Plan*, 995 F.2d 804, 806 (8th Cir. 1993) ("To ensure uniformity in the administration of benefits under the Act (and thus control costs), section 8902(m)(1) mandates that once the OPM enters into a benefits contract, that contract has the preemptive force of federal law."); *Burkey v. Gov't Emps. Hosp. Ass'n*, 983 F.2d 656, 660 (5th Cir. 1993) ("The policy underlying § 8902(m)(1) is to ensure nationwide uniformity of the administration of FEHBA benefits."). OPM itself has recognized Congress's desire for uniformity. In explaining its decision to adopt the regulations now codified at 5 C.F.R. §§ 890.105 and 890.107 (which changed the procedure for beneficiaries to challenge a denial of benefits from a suit by the beneficiary against the insurance carrier to a suit by the beneficiary to review the OPM decision), OPM wrote: "Congress, in the [FEHBA], mandated Federal uniformity for all matters that relate to (1) the nature or extent of coverage; (2) benefits; and

(3) payment of benefits under the FEHB Program." 60 Fed. Reg. at 16,037 (Mar. 29, 1995).

Weight Loss does not attempt to dispute these factors supporting deferential review under an arbitrary-and-capricious standard. Its sole argument against deference is that health-insurance contracts do not necessarily involve arcane or technical language and that a court is just as qualified as OPM to interpret ordinary language. But this argument both (1) understates the complexity of health-care contracts and (2) implicitly overstates the deference due under arbitrary-and-capricious review. On the first point, we would note that contract language need not be arcane to require expertise in its interpretation. Even when the language of a paragraph may seem clear in isolation, the interrelationships of provisions can create complications. A full understanding of such interrelationships can be essential in interpreting a lengthy health-care plan that makes detailed distinctions in many dimensions of coverage. *See, e.g.*, *Nesseim*, 995 F.2d at 805–07 (Insurance plan covered chemotherapy, but insured's proposed breast-cancer chemotherapy treatment required high-dose chemotherapy that had to be accompanied by autologous bone-marrow transplant, which was covered only for certain enumerated diseases that did not include breast cancer. OPM determined that the bone-marrow transplant was not covered because breast cancer was not one of the specifically enumerated diseases and because another provision barred all transplants not specifically listed as covered.). And on the

-9-

second point, we emphasize that if a policy is straightforward in a particular respect, a court need not defer to an unreasonable OPM decision that rules otherwise. The deference we should give to OPM interpretations is not absolute. Not surprisingly, under arbitrary-and-capricious review we will not endorse an OPM interpretation if it is arbitrary or capricious.

Thus, we agree with the Eleventh Circuit, which justified deference to OPM as follows:

> OPM cannot successfully argue that it has a comparative advantage over a court in the task of contract interpretation in the abstract. However, OPM does have relevant expertise in this area because it negotiates the contracts at issue and, pursuant to the FEHBA, routinely interprets plans to determine an insurance carrier's liability. More generally, Congress has given OPM broad authority to regulate the field in which OPM negotiates the insurance contracts. Finally, OPM has the ability to take a broad, national view when it interprets plans which serves the function of ensuring consistent, nationwide application.

*Muratore,* 222 F.3d at 922–23 (citations omitted). The Eighth Circuit has adopted the same arbitrary-and-capricious standard of review. *See Nesseim*, 995 F.2d at 807–08.

We recognize that *Burgin v. Office of Pers. Mgmt.*, 120 F.3d 494 (4th Cir. 1997), held otherwise, refusing to defer to OPM's interpretation of a contract because contract interpretation is "a question of law clearly within the competence of courts." *Id.* at 498. Given that *Burgin* is contrary to the Fourth Circuit's earlier decision in *Caudill v. Blue Cross & Blue Shield*, 999 F.2d 74,

-10-

79–80 (4th Cir. 1993) (deferring to OPM interpretation of health-benefit contracts), *overruled on other grounds by Empire HealthChoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 683, 689 (2006), it is unclear whether it is controlling even in that circuit. *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls."). But in any event, we do not find *Burgin* persuasive. It ignores OPM's experience and expertise as well as the statutory scheme that gives OPM the primary and principal role of interpreting health-plan contracts with federal employees.

In sum, we review OPM's interpretation of the Blue Cross Plan under an arbitrary-and-capricious standard.

## B.    Interpretation of the Contract

To explain the dispute regarding the meaning of Walters's Blue Cross Plan, we start with a sketch of the Plan, a 130-page document. The amounts paid by the Plan and by the insured for medical services incurred by the insured depend on the type of service provided and the service provider's contractual relationship with Blue Cross. The categories of services include, among others, medical services and supplies, surgical and anesthesia services, services provided by a hospital or other facility, emergency services, and prescription drug benefits. Within each category the payment arrangement may further depend on the

specific service. For example, payments by the Plan and the insured to a hospital or other facility differ for inpatient and outpatient services.

Providers are divided into preferred, participating, and non-participating categories depending on their contractual arrangement with the Plan. Preferred and participating providers have fee agreements with Blue Cross that limit the amount that the insured must pay, but the share of the fee paid by the insured is greater for service from participating providers than for preferred providers. Non-participating providers have no contract with Blue Cross. The insured is responsible for whatever the provider bills the insured, but the Plan may pay a percentage of the allowance it computes for the service. As would be expected, the amount that the insured pays for a service will be the least if the provider is a preferred provider and the most if the provider is a non-participating provider.

The dispute in this case concerns only what the Plan should pay for services provided to an outpatient by a non-participating hospital or other facility. In particular, there has been no claim for "[m]edical services and supplies provided by physicians and other health care professionals," Aplt. App. at 114 (Blue Cross Plan at 27), or for "[s]urgical and anesthesia services provided by physicians and other health care professionals." *Id.* at 135 (Blue Cross Plan at 48). For "[o]utpatient surgery and related services performed and billed for by a hospital or freestanding ambulatory facility" that is a non-participating (also called a non-member) facility, the Plan will pay 70% of its "allowance" for the

-12-

service; the insured pays the remainder (30% of the allowance plus the difference between the allowance and the amount billed).  *Id.* at 154 (Blue Cross Plan at 67).  The parties differ regarding what the Plan should have computed as the "allowance" for the services provided to Walters.

A provision of the Plan describes how Blue Cross computes allowances for non-participating providers.  Although the issue before us concerns only non-participating facilities providing outpatient care, we include the paragraphs preceding and following the paragraph for outpatient care because the contrast is informative:

> **Non-participating providers**—We have no agreements with these providers.  We determine our allowance as follows:
> - *For inpatient services* at hospitals, and other facilities that do not contract with your local Blue Cross and Blue Shield Plan ("Non-member facilities"), *our allowance is based on the average amount paid nationally* to contracting and non-contracting facilities for covered room, board, and ancillary charges *for your type of admission*.  For inpatient stays resulting from medical emergencies or accidental injuries, or for routine deliveries, our allowance is the billed amount;
> - *For outpatient, non-emergency surgical services* at hospitals and other facilities that do not contract with your local Blue Cross and Blue Shield Plan ("Non-member facilities"), *our allowance is the average amount for outpatient surgical services* that we pay *nationally* to contracting and non-contracting facilities.  For other outpatient services by Non-member facilities, and for outpatient surgical services resulting from a medical emergency or accidental injury, our allowance is the billed amount (minus any amounts for noncovered services);
> - *For physicians and other covered health care professionals* that do not contract with your local Blue Cross and Blue Shield Plan, *our allowance is equal to the greater of 1) the*

> *Medicare participating fee schedule amount for the service or supply in the geographic area* in which it was performed or obtained (or 60% of the billed charge if there is no equivalent Medicare fee schedule amount) *or 2) 100% of the 2008 Usual, Customary, and Reasonable (UCR) amount for the service or supply in the geographic area* in which it was performed or obtained. Local Plans determine the UCR amount in different ways. Contact your Local Plan if you need more information. We may refer to our allowance for Non-participating providers as the "NPA" (for "Non-participating Provider Allowance");

*Id.* at 206 (Blue Cross Plan at 119) (emphasis added).

OPM interpreted this language to mean that the Plan allowance for outpatient surgery was the national average that Blue Cross paid for all outpatient surgeries. Weight Loss contends that the allowance should be the national average for gastric-band laparoscopic surgery. It argues that the meaning of the Plan is ambiguous and it should therefore be interpreted in favor of the insured. As explained in the prior section, however, we will affirm OPM's interpretation if it is reasonable, and therefore not arbitrary or capricious.

In our view OPM's interpretation is not only reasonable but the most plausible. The Blue Cross Plan provides that the Plan allowance for outpatient surgical services is "the average amount for outpatient surgical services that we pay nationally to contracting and non-contracting facilities." *Id.* In isolation, this language might be read to mean that Blue Cross would average all services of a particular type, rather than aggregating all outpatient surgical services regardless of the surgery performed. That is, one could read the Plan language as referring

-14-

to "the average amount for outpatient surgical services *of the same type* that we pay nationally," or, equivalently, "the average amount for *the* outpatient surgical service that we pay nationally."

But the language of the preceding and following paragraphs of the allowance provision in the Plan shows that such a reading would be incorrect. In the paragraph immediately preceding the paragraph discussing the Plan allowance for outpatient surgery, the Plan states that the allowance for "inpatient services at hospitals . . . is based on the average amount paid nationally . . . *for your type of admission*." *Id.* (emphasis added). The inpatient Plan allowance is clearly based on the condition or procedure that causes the insured to be hospitalized. And similarly, the paragraph immediately after the paragraph at issue in this case says that the Plan allowance for doctors and other health care professionals is the greater of "the Medicare . . . schedule amount for *the* service or supply" and the "(UCR) amount for *the* service or supply." *Id.* (emphasis added). Unlike the paragraph at issue, these two paragraphs include language making clear that the average is an average for the particular service provided to the insured.

We will not read the dispositive paragraph as implicitly including language that the drafters explicitly included in adjacent paragraphs; the decision not to include such language is apparent. When faced with language that could bear two meanings, attorneys (and, too often, courts) may try to resolve the ambiguity in favor of their preferred meaning by arguing that if the drafters had intended the

other meaning, they could have added or changed language to make that clear. The weakness of the argument is that the drafters could equally have added or changed language to make clear that they intended the preferred meaning. The force of the argument is greatly strengthened, however, when the drafters in fact had used the alternative language elsewhere. When the drafters so clearly knew how to express one meaning, their failure to do so implies that the meaning was not intended. Here, that argument is particularly compelling because if the drafters of the Plan had intended the meaning suggested by Weight Loss, they could have used the method of expression employed in either the preceding or succeeding paragraph. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections [of the statute] has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."); *Reg'l Air, Inc. v. Canal Ins. Co.*, 639 F.3d 1229, 1238 (10th Cir. 2011) ( "Where, as here, a legislature uses different terms in the very same statutory provision, we take cognizance of that choice by presuming the legislature intended the different words to carry with them (their traditional) different meanings.").

Nevertheless, relying on the reasonable-insured standard for reviewing insurance contracts, Weight Loss argues that OPM's interpretation of the Plan is

untenable.[1] It argues that any reasonable person who paid the extra premium to be covered under a Blue Cross Standard Plan, rather than the cheaper Basic Plan (which did not provide any benefits for care by a non-participating provider), would expect a much more significant payment by Blue Cross for Walters's lap-band surgery—certainly much more than the 3% of the Weight Loss bill paid by Blue Cross.

We are not persuaded. Weight Loss tries to take the reasonable-insured standard too far. The standard does not displace contractual language. It is not enough for the insured to expect a particular loss or expense to be covered. *See Marshall v. Kan. Med. Mut. Ins. Co.*, 73 P.3d 120, 130 (Kan. 2003) (Reasonable-insured standard "does not mean that the policy should be construed according to the insured's uninformed expectations of the policy's coverage."). The "reasonable insured" must be able to point to specific contractual language that provides coverage. The reasonable-insured standard prevents the insurance company from relying on an idiosyncratic construction of undefined terms that differs from the ordinary meaning. *See LaAsmar v. Phelps Dodge Corp. Life*, 605

---

[1] Because the reasonable-insured standard is not disputed by the parties and appears to be universal, *see*, *e.g.*, *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007) (applying federal law); *Schartz v. Kan. Health Ins. Ass'n*, 66 P.3d 866, 869 (Kan. 2003) (applying Kansas law); 2 Steven Plitt et al., Couch on Insurance 3D § 21:14, at pg. 21-48 (2010) ("The test to be applied by the court in determining whether there is ambiguity is not what the insurer intended its words to mean but what a reasonably prudent person applying for insurance would have understood them to mean."), we need not decide what jurisdiction's law applies.

F.3d 789, 809–13 (10th Cir. 2010) (rejecting peculiar meaning of "accident" proffered by insurer). But it does not excuse the insured from reading the policy, the entire policy. Under the reasonable-insured standard, it is still necessary to "examine the plan documents as a whole." *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007) (brackets omitted). When the contract read as a whole resolves the ambiguity, there is no occasion to apply the reasonable-insured standard. *See Long v. St. Paul Fire & Marine Ins. Co.*, 589 F.3d 1075, 1082–83 (10th Cir. 2009) (rejecting insured's proffered interpretation of contested provision because interpretation would be inconsistent with remainder of policy).

The Blue Cross Plan makes clear that some health-care expenses are not covered, and that the expense to the insured of using a non-participating provider can be unlimited. How much is not covered can turn on numerous factors, including how much the non-participating provider charges. Only a careful study of the Plan's provisions can reveal whether a particular payment should be expected. Payment of a higher premium than required for another plan cannot mean that full coverage must be provided for everything not covered in the less-expensive plan. Most importantly, as explained above, when the "allowance" provision at issue on this appeal is read in the context of the adjacent allowance provisions, Weight Loss's interpretation of the provision is not reasonable. At the least, even if one gives the reasonable-insured standard more force than the case law appears to, we cannot say that OPM's interpretation of the allowance

-18-

provision is arbitrary, capricious, or unreasonable. We therefore affirm OPM's reading of the Plan.

## C.     Sufficiency of the OPM Record

Finally, Weight Loss contends that OPM's decision was arbitrary and capricious because it did not obtain the data or calculations used by Blue Cross to determine that the Plan allowance for Weight Loss's charges was only $2,300. According to the Plan, the allowance should be "the average amount for outpatient surgical services that we pay nationally to contracting and non-contracting facilities." Aplt. App. at 206 (Blue Cross Plan at 119). In response to Weight Loss's contention, Blue Cross has stated that the data were accumulated nationally for all Blue Cross plans, and it did not have the data or calculations itself.

Weight Loss argued before the OPM that because there was no explanation of how the $2,300 Plan allowance was calculated, it was impossible to determine whether the Plan allowance was correct. OPM's decision did not address this aspect of Weight Loss's complaint but merely stated: "The Plan provided benefits at 70 percent of $2,300.00, the Non-participating provider allowance for the surgical services." *Id.* at 83. OPM did not request the underlying data.

In district court Weight Loss pursued the issue, arguing that the record was incomplete and prevented anyone from "verify[ing] the plan allowance calculation." *Id.* at 241. OPM again stated only that "[Weight Loss] was advised

-19-

that the national average for outpatient surgical services paid nationally to contracting and non-contracting facilities was $2300." *Id.* at 276. The district court found that the record was sufficient and stated, despite Weight Loss's argument, that "the reliability of the data used in reaching the plan allowance figure" was not at issue. *Id.* at 314. We disagree.

Before both OPM and the district court, Weight Loss raised the accuracy of the Plan-allowance calculation as an issue. Yet nothing in the record would enable OPM to find that the calculation was correct. OPM has never explained why it believed in the accuracy of the $2,300 figure. It apparently just took Blue Cross at its word. In our view, to do so without explanation was arbitrary and capricious.

OPM argues that neither Weight Loss nor Walters has any right to "detailed calculations, statistics, formulas, numbers, or any other mathematical information for the claim submitted to the Blue Cross plan." Aplee. Br. at 52. But this argument misses the point. The issue is not whether Weight Loss or Walters has a right in the abstract to obtain such data. The issue is whether OPM can make a finding necessary to its decision—namely a finding that the proper allowance was $2,300—without any supporting evidence or even an explanation of why evidence was unnecessary. We therefore must send this dispute back to OPM for further proceedings. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, . . . the

proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

## II.    CONCLUSION

Although we affirm OPM's interpretation of the Blue Cross Plan, we hold that OPM's decision was arbitrary and capricious for failure to explain why it accepted Blue Cross's allowance figure as correct.  We therefore REVERSE the judgment of the district court with instructions to set aside the OPM ruling and REMAND to OPM for further proceedings.

<u>Weight Loss Healthcare Centers of America v. OPM</u>, No. 10-3247
**EBEL**, J., concurring.


     I concur.  But I would admonish the Office of Personnel Management

("OPM") that the need to resolve difficult issues of interpretation of a Plan could

be avoided if OPM would require health insurers to make their plan language

clear.  The way the clause at issue in this case was written is counterintuitive to

how a Plan participant would understand his health insurance to work.  OPM and

the insurer are doing federal employees and other Plan beneficiaries a disservice,

the insurer by drafting the terms of the Plan using such ambiguous language and

OPM by permitting it.  Nevertheless, in this case, I cannot fault OPM for

choosing one of several reasonable interpretations of the language at issue here.

Nor can I fault the panel for deferring to OPM's interpretation.  Thus, I concur.