**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 26, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

CCCOK, INC.,

      Plaintiff - Appellant,

v.

SOUTHWESTERN BELL TELEPHONE
L.P., d/b/a AT&T of Oklahoma, f/k/a
SWBT; THE CORPORATION
COMMISSION OF OKLAHOMA; JEFF
CLOUD, in his official capacity as
Chairman of The Corporation
Commission of Oklahoma; DENISE A.
BODE, in her official capacity as Former
Commissioner of The Corporation
Commission of Oklahoma; BOB
ANTHONY, in his official capacity as
Commissioner of the Corporation
Commission of Oklahoma,

      Defendants - Appellees.

No. 11-6016
(D.C. No. 5:07-CV-00629-M)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO** and **MATHESON,** Circuit Judges**,** and **FREUDENTHAL**,[†] District
Judge.

---

     [*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

     [†] The Honorable Nancy D. Freudenthal, United States District Judge, United
States District Court for the District of Wyoming, sitting by designation.

In 2005, Appellant CCCOK, Inc. ("CCCOK") filed a complaint at the Oklahoma Corporation Commission ("OCC") against Southwestern Bell Telephone, L.P. ("SWBT").[1] CCCOK sought an order directing SWBT to pay it over two-million dollars in compensation for SWBT's alleged breach of a contract between CCCOK and SWBT (the "Parties").

The OCC rejected CCCOK's claim, concluding that CCCOK was not entitled to compensation under the "clear and unambiguous" language of the Parties' contract. *CCCOK, Inc. v. Sw. Bell Tel., L.P.*, OCC Order No. 538697, at 5 (May 2, 2007) ("*OCC Order*"). The OCC also noted in dicta that "the interpretation of the [contract] urged by [CCCOK] [was] unreasonable and contrary to the public interest, and [that it] would lead to unintended and absurd consequences." *Id.*

The United States District Court for the Western District of Oklahoma affirmed the OCC's ruling. CCCOK appealed. On appeal, CCCOK contends that the OCC's ruling was arbitrary and capricious because it: (1) disregarded the terms of the Parties' contract; (2) contradicted record evidence; and (3) violated CCCOK's rights under state and federal law.

The district court had jurisdiction to consider CCCOK's claim pursuant to 47 U.S.C. § 252(e)(6). *See Sw. Bell Tel. Co. v. Brooks Fiber Commc'ns. of Okla., Inc.*, 235 F.3d 493, 497 (10th Cir. 2000). Exercising jurisdiction under 28 U.S.C. § 1291, we hold

---

[1] Sometime after CCCOK filed its OCC Complaint, SWBT was acquired by AT&T of Oklahoma. For clarity, we refer to the Appellees as SWBT.

2

that the OCC's ruling was not arbitrary and capricious and we affirm the district court's decision.

## I. BACKGROUND

### A. *Factual and Legal Background*

This appeal concerns the OCC's rejection of a claim of breach of contract filed by CCCOK against SWBT. The Parties' adopted their contract, and the OCC approved it, pursuant to the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, codified at 47 U.S.C. § 151 et seq. (the "Telecommunications Act" or the "Act"). We begin by providing a brief overview of the Telecommunications Act.

### 1. *The Telecommunications Act*

Congress passed the Telecommunications Act "to encourage competition in the telephone services industry." *Brooks*, 235 F.3d at 495. The Act requires local exchange carriers[2]—i.e., telephone companies—competing within the same geographic area to "interconnect" their telephone networks "to ensure that callers who subscribe to one local telephone service can receive calls from, and place calls to, those who subscribe to a different local telephone service." *Id.*

The Act also requires local exchange carriers to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). Such arrangements provide that when a customer of Carrier A makes a local call to a customer of Carrier B, the carrier for the *calling* party (Carrier A)

---

[2] "The term 'local exchange carrier' means any person that is engaged in the provision of telephone exchange service or exchange access." 47 U.S.C. § 153(32).

is required to compensate the carrier for the *called* party (Carrier B) for transporting and terminating—i.e., delivering— the call to its destination. *See* 47 C.F.R. § 51.701(e).

The exact terms and conditions under which local exchange carriers interconnect and provide reciprocal compensation are contained in contracts referred to as "interconnection agreements." *See Brooks*, 235 F.3d at 495. The Act requires that all interconnection agreements be approved by a state commission, which must ensure that a proposed agreement complies with the Telecommunication Act's provisions. *See* 47 U.S.C. § 252(e)(1), (2)(b).

In many instances, the terms of an interconnection agreement are created through mutual negotiation. However, section 252(i) of the Telecommunications Act requires local exchange carriers to "make available any interconnection, service, or network element provided [in any interconnection agreement] to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement." 47 U.S.C. § 252(i). Thus, new local exchange carriers may choose to adopt the terms of an existing interconnection agreement and to have that agreement approved by the relevant state commission instead of negotiating new terms with an existing local exchange carrier. *See id.*

### 2. *The Parties*

SWBT is a local exchange carrier that provides traditional landline telephone service throughout the state of Oklahoma. Sometime before 1998, Ted L. Snider—the owner and creator of CCCOK—learned of an interconnection agreement between SWBT and another local exchange company that featured "an unusually high reciprocal

4

compensation rate . . . for exchange of Local Traffic." Aplt. Opening Br., at 4 n.2.

As CCCOK acknowledges in its brief, Mr. Snider designed a plan to "exploit the . . . opportunity presented by the unusually high reciprocal compensation rate." *Id.* To accomplish his objective, Mr. Snider began operating two entities in the state of Oklahoma: (1) Zipramp, Inc., an internet service provider; and (2) CCCOK, a local exchange company that provided "managed modem services" to ZipRamp. ZipRamp was CCCOK's only end user. In other words, ZipRamp was the only customer that subscribed to CCCOK's managed modem service.

In 1998, CCCOK adopted the terms of the existing interconnection agreement between SWBT and the other local exchange carrier that featured the "unusually high reciprocal compensation rate." *Id.* In 1999, the OCC approved the interconnection agreement between CCCOK and SWBT (the "ICA").

## 3. *The ICA*

Section III of the ICA contains a reciprocal compensation agreement, which, in pertinent part, states:

> For purposes of compensation under this Agreement, the telecommunications traffic traded between the Parties shall be classified as either Local traffic, Through-put traffic, IntraLata Interexchange traffic, or InterLATA Interexchange. . . .
>
> Calls originated by one Party's end users and terminated to the other Party's end users shall be classified as local traffic under this Agreement if the call originates and terminates in the same SWBT exchange area. . . . Calls not classified as local under this Agreement shall be treated as interexchange for intercompany compensation purposes.

5

ROA, at 469.

### 4. *ZipRamp and the MegaPort Service*

In early 2001, ZipRamp began offering an internet service called "MegaPort" in Oklahoma. During the six months that it was in operation, ZipRamp provided the MegaPort service to approximately 129 customers. The vast majority of its customers were churches, schools, and nonprofit organizations to whom ZipRamp offered the MegaPort service free of charge. All of ZipRamp's customers were SWBT end users. In other words, all of ZipRamp's customers subscribed to SWBT's telephone services.

The Megaport service allowed customers to access the internet using SWBT's local telephone facilities and equipment provided by ZipRamp. ZipRamp provided each customer two high capacity telephone lines referred to as "SuperTrunks." Each SuperTrunk contained 48 voice-graded telephone lines and created a direct T-1 connection from the SWBT switch to the ZipRamp customers' premises.

ZipRamp also provided each of its customers a Lucent router—a modem and routing device. ZipRamp programmed the Lucent routers to auto-dial, connect, and maintain between 20 and 32 concurrent telephone calls at a time. The auto-dialed telephone calls were placed 24 hours a day, seven days a week, even if the ZipRamp customers were not using their computers or their computers were turned off.

All of the auto-dialed telephone calls placed by the Lucent routers were directed to CCCOK's managed modem service and were terminated to ZipRamp—CCCOK's only end user. ZipRamp configured the Lucent routers so that its customers could not dial telephone numbers of their choosing or use the SuperTrunk lines to make voice calls.

6

ZipRamp also disabled a feature on the Lucent routers referred to as "dynamic bandwidth allocation." This feature was designed to decrease or increase the number of connections initiated by a router based on a user's internet activity. By disabling dynamic bandwidth allocation—and thereby preventing the Lucent routers from increasing or decreasing connections as a user's internet activity required—ZipRamp ensured that the routers would generate maximum call traffic at all times.

Using this equipment, ZipRamp connected its customers' computers to the internet as follows:

    a.  The Lucent routers at the ZipRamp customers' premises placed numerous concurrent auto-dialed telephone calls 24 hours a day, seven days a week;

    b.  the auto-dialed calls traveled from the ZipRamp customer/SWBT end users' premises via SWBT telephone lines to the SWBT switch;[3]

    c.  the SWBT switch sent an electronic message to CCCOK requesting a telephone connection to CCCOK's switch;

    d.  CCCOK terminated—i.e., delivered—the auto-dialed calls to ZipRamp; and

    e.  ZipRamp used several modems to connect the calls to the internet.

**5.** *The ZipRamp Service Contract and Letters of Agency*

All of the customers that signed up for the MegaPort service signed a service contract with ZipRamp (the "Service Contract"). In relevant part, the Service Contract provides:

---

[3] The term "switch" refers to equipment that directs a call to its destination. *See Qwest Corp. v. Pub. Utils. Comm'n. of Colo.*, 479 F.3d 1184, 1193 (10th Cir. 2007).

1. **Introduction**: During the term (as defined below) of this Agreement, ZIPRAMP will provide Customer with MegaPort Service. Megaport Service is Broadband Internet Access Service that includes an allocation of ____ IP Addresses for the customer's sole and exclusive use, utilizing the equipment and facilities described . . . below. . . .

2. **Equipment and Facilities:** In order to facilitate MegaPort Service, ZIPRAMP will install a Lucent Max 4000 Router, or a comparable piece of equipment, on the customer premises, to which the customer's existing computer network will be connected. ZIPRAMP will, as agent for the customer . . . order and install two (2) SuperTrunks from Southwestern Bell Telephone.

ROA, at 541-42.

Each ZipRamp customer also signed a Letter of Agency that was attached to the Service Contract. The Letters of Agency state:

I hereby authorize ZipRamp, Inc. (ZipRamp), to act as my agent in provisioning and order two (2) SuperTrunks from Southwestern Bell Telephone as described in Southwestern Bell Telephone's Integrated Services Tariff, Part 4, Subpart 4.7. In addition, I further authorize ZipRamp to block optional services not limited to the following: Third Party Billing and Collect Calling, Long Distance and International Long Distance, All 900 Services, Three Way Calling, Call Return, Call Blocker, Auto Redial, Calling Card Services, PIC and LPIC. I also agree that I will not contract with Southwestern Bell Telephone to add any additional equipment or services to the circuits that are the subject of this agreement. I further authorize ZipRamp to handle the necessary arrangements, including billing and responding to any inquiries by Southwestern Bell Telephone.

ROA at 548.

The Service Contract and Letters of Agency did not inform the ZipRamp customers that numerous concurrent auto-dialed telephone calls would be placed by the

8

Lucent routers to ZipRamp 24 hours a day, seven days a week.

### 6. *The Dispute*

From January 2001 to June 2001, the Lucent routers installed by ZipRamp initiated a large number of telephone calls (the "MegaPort Traffic") on SWBT's telephone network that passed through CCCOK's managed modem service and terminated to ZipRamp—CCCOK's only end user. The MegaPort Traffic produced nearly two-hundred-million minutes of use that were recorded by CCCOK and SWBT.

In February 2001, CCCOK began sending SWBT monthly invoices requesting reciprocal compensation for the MegaPort Traffic. Added together, the invoices from February, March, April, May, and June requested more than two-million-dollars in reciprocal compensation.

In February 2001, SWBT paid the amount requested in CCCOK's invoice in full. In the subsequent months, however, the amounts of reciprocal compensation requested by CCCOK increased significantly. SWBT discovered that the MegaPort Traffic was generated by the auto-dialed calls placed by the Lucent routers that ZipRamp programmed and installed at the ZipRamp customers'/SWBT end users' premises. SWBT formally disputed the charges contained in the invoices and refused to pay CCCOK. As a result of its inability to collect the revenues it expected, CCCOK ceased doing business in Oklahoma in June 2001.

### B. *Procedural History*

### 1. *The OCC Challenge*

On January 3, 2005, CCCOK filed a complaint against SWBT at the Oklahoma

9

Corporation Commission. CCCOK sought an order finding that SWBT had breached its obligations under the ICA and directing SWBT to pay it for all of the MegaPort Traffic as originally invoiced.

After holding a hearing, the OCC issued a written order rejecting CCCOK's claim. *See OCC Order*, at 6. The OCC found the terms of the ICA "clear and unambiguous." *Id.* at 5. Based on its interpretation of those terms, the OCC concluded "that the ICA requires payment of reciprocal compensation" only for traffic that qualifies as telecommunications traffic. *Id.* at 4. The OCC stated that "[t]o qualify for reciprocal compensation under the ICA, [telecommunications] traffic must be originated by [an SWBT] end user, must consist of information of the user's choosing, and must be terminated at the direction of the [SWBT] end user[] at the destination[] of the end user's choice." *Id.* at 6. After conducting a thorough review of the record, the OCC concluded that the MegaPort Traffic did not satisfy any of these requirements.

The OCC noted that it could "find no evidence in the record . . . establish[ing] that any [SWBT] end user actually made use of [the] MegaPort service, or originated any call[s] on [CCCOK's] network." *Id.* at 3. It further noted that "[t]he undisputed evidence show[ed] that the [MegaPort] [T]raffic was generated by equipment owned by [ZipRamp], installed at the [SWBT] end user's premises and programed to operate as an auto-dialer." *Id.* Additionally, it stated that there was no evidence in the record demonstrating that the SWBT end users had authorized ZipRamp to place the auto-dialed calls on their behalf. *See id.* at 3-4. Based on these findings, the OCC concluded that the MegaPort Traffic "was not originated by [an SWBT] end user." *Id.* at 3.

10

The OCC also found that the SWBT "end users had no control over the termination of the traffic generated by [ZipRamp's] equipment" and that the "end users could not use [the] MegaPort service to dial numbers of their choosing or to reach other points on the Public Switched Telephone Network." *Id.* at 4. It therefore concluded that the MegaPort Traffic was "neither terminated at the direction of [an SWBT] end user[] nor at destinations of the end user's choice." *Id.* Finally, the OCC found that there was "[n]o evidence . . . in the record that any 'information of the user's choosing' was transmitted on [ZipRamp's] network." *Id.*

Because it concluded that the MegaPort Traffic did not satisfy any of these requirements, the OCC stated: "Having completed a thorough review of the record, [we] find[] that [the] MegaPort [T]raffic does not qualify for reciprocal compensation under the clear and unambiguous provisions of the ICA." *Id.* at 5.

After ruling that the MegaPort Traffic did "not qualify for reciprocal compensation under the clear and unambiguous provisions of the ICA," the OCC stated in dicta:

> On the other hand, the interpretation of the ICA urged by [CCCOK] is unreasonable and contrary to the public interest, and would lead to unintended and absurd consequences. . . . The Commission cannot reasonably interpret the ICA to require compensation where—as here—the only economic purpose for the underlying service is the generation of reciprocal compensation. Neither can the Commission interpret the ICA to require compensation for a business practice by which the legitimate and trusting nature of schools, churches, and not-for-profit organizations were exploited . . . . Such an interpretation would be contrary to the public interest.

11

*Id.* at 5 (quotations omitted).

### 2. *The District Court Challenge*

CCCOK challenged the OCC's decision in the United States District Court for the Western District of Oklahoma. *See CCCOK, Inc. v. Sw. Bell Tel., L.P.*, No. 5:07-cv-00629-M, 2010 U.S. Dist. LEXIS 135155 (W.D. Okla. Dec. 21, 2010). CCCOK argued that the OCC's decision was arbitrary and capricious for three reasons. First, it contended that the "OCC ignored substantial and undisputed record evidence proving that the disputed traffic was compensable under the . . . ICA." *Id.* at *6. Second, it claimed that the OCC "failed to acknowledge, much less follow, the unambiguous terms of the . . . ICA." *Id.* Finally, it asserted that the OCC's ruling "ignored the decision of the 10th Circuit Court of Appeals in *Southwestern Bell Telephone Co. v. Brooks Fiber Communications of Oklahoma, Inc.*, 235 F.3d 493 (10th Cir. 2000)." [4] *Id.* at *11. The district court rejected these arguments and affirmed the OCC's ruling, concluding that "the actions of the OCC [were] properly supported by the evidence presented." *Id.* at *9. CCCOK then filed the instant appeal.

## II. DISCUSSION

On appeal, CCCOK contends that the OCC's ruling was arbitrary and capricious for three reasons. First, it argues that the OCC's decision contradicts the terms of the ICA. Second, it argues that the OCC's ruling ignores and contradicts substantial and undisputed record evidence. Finally, it asserts that the OCC's statements concerning the

---

[4] CCCOK has not reasserted this argument on appeal.

interpretation of the ICA advanced by CCCOK violated its rights under state and federal law.[5]

We review the OCC's application of state law principles to interpret and apply the Parties' ICA under an arbitrary and capricious standard of review. *See Brooks*, 235 F.3d at 498. Agency action is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency action "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793 (10th Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency's interpretation of a contract is arbitrary and capricious if the interpretation is unreasonable. *See Weight Loss Healthcare Ctrs. of Am., Inc. v. OPM*, 2011 U.S. App. LEXIS 17529, --- F.3d --- (10th Cir. 2011); *Brooks*, 235 F.3d at 499 ("We believe the OCC reasonably interpreted the Agreement . . . we [therefore] find that the OCC's interpretation . . . was neither arbitrary nor capricious."). In reviewing agency actions under the "arbitrary or capricious standard," the court's duty "is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the

---

[5] In its reply brief, CCCOK also argues that the OCC's decision was arbitrary and capricious because it relied on factors that Congress did not intend it to consider. We have consistently stated that we will not consider arguments raised for the first time in a reply brief. *See, e.g.*, *United States v. Harrell,* 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived."). We therefore decline to address CCCOK's argument that the OCC relied on factors that Congress did not intend it to consider.

decision made." *McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1253 (10th Cir. 2010) (quotations omitted).

### A. *The OCC's Interpretation of the ICA*

We first consider whether the OCC's interpretation of the ICA was arbitrary and capricious. "The Agreement itself and state law principles govern[ed] the [OCC's] . . . interpretation of the [ICA]." *Brooks*, 235 F.3d at 499. Under the arbitrary and capricious standard of review, we will affirm the OCC's interpretation as long as it is reasonable. *Id.*

Under Oklahoma law, "[a] contract must be . . . interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." Okla. Stat. tit. 15, § 152. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." *Id.* § 155. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others." *Id.* § 157.

In relevant part, Section III of the ICA states:

> For purposes of compensation under this Agreement, the *telecommunications traffic* traded between the Parties shall be classified as either Local traffic, Through-put traffic, IntraLata Interexchange traffic, or InterLATA Interexchange. . . .
>
> Calls originated by one Party's end users and terminated to the other Party's end users shall be classified as local traffic under this Agreement if the call originates and terminates in the same SWBT exchange area. . . . *Calls not classified as local under this Agreement shall be treated as*

14

*interexchange for intercompany compensation purposes.*

ROA, at 469 (emphases added).

The OCC found this language to be "clear and unambiguous." Based on the text of Section III, the OCC concluded "that the ICA requires payment of reciprocal compensation" only for telecommunications traffic. *See OCC Order*, at 4 ("The Commission . . . finds that the ICA requires payment of reciprocal compensation on traffic described in terms of 'telecommunications.'").

CCCOK argues that the OCC's conclusion that the ICA requires reciprocal compensation only for telecommunications traffic contradicts the terms of the ICA. CCCOK contends that all "calls," even those that do not qualify as telecommunications traffic, are compensable under the ICA. To reach this conclusion, CCCOK relies on the last sentence of Section III, which states that "[*c*]*alls* not classified as local under this Agreement shall be treated as interexchange for intercompany compensation purposes." (emphasis added). Based on this provision, CCCOK claims that all "calls" are compensable under the ICA. It asserts: "Even if . . . the disputed calls were not . . . 'telecommunications,' the record is undisputed that they are calls . . . they were [therefore] compensable . . . as interexchange [traffic]."[6] Aplt. Opening Br., at 17.

---

[6] We note that CCCOK's argument that even "calls" that do not qualify as "telecommunications" are compensable under the ICA appears to contradict other portions of its opening and reply briefs. For instance, on pages two and three of its reply brief, CCCOK states: "According to the plain and unambiguous language of the parties' [ICA], 'calls' refer to compensable 'telecommunications traffic traded between the Parties.'" Similarly, on page 12 of its opening brief, CCCOK states that the Parties "expressly agreed that all 'telecommunications traffic between the parties' would be compensated pursuant to Article III of the [ICA]."

15

The OCC did not read the ICA this way. Our task is not to decide whether CCCOK or the OCC has the best or most plausible interpretation of the ICA. Instead, our job is to decide whether the OCC's interpretation of the ICA was reasonable, and we conclude that it was.

We recognize that the final sentence of Section III uses the term "calls" instead of the term "telecommunications traffic." But we believe it was reasonable for the OCC to interpret the ICA as requiring reciprocal compensation only for "calls" that qualify as telecommunications traffic.

The first sentence of Section III lists four categories of "telecommunications traffic" that qualify for compensation under the ICA: (1) Local Traffic, (2) Through-put traffic, (3) IntraLata Interexchange traffic, and (4) InterLATA Interexchange. The final sentence of Section III states that "Calls not classified as local under this Agreement shall be treated as interexchange for intercompany compensation purposes." When read in conjunction, it is reasonable to understand the term "interexchange" in the final sentence of Section III as referring to the "Interexchange" categories in the first sentence. It is also reasonable to conclude that the term "interexchange" in the final sentence included the categories of telecommunications traffic listed in the first sentence of Section III. Based on its reading of the ICA, the OCC concluded that the ICA required reciprocal compensation only for telecommunications traffic; calls that do not qualify as telecommunications traffic were not compensable.

We believe the OCC's interpretation of the ICA was reasonable. We therefore hold that the OCC's interpretation was neither arbitrary nor capricious.

16

### B. The OCC's Review of the Evidence and Enforcement of the ICA's Terms

We next consider whether the OCC's ruling ignores or contradicts record evidence. The OCC determined that to qualify for reciprocal compensation under the "clear and unambiguous" terms of the ICA, telecommunications traffic must: (1) be originated by an SWBT end user, (2) consist of information of an SWBT end user's choosing, and (3) be terminated at the direction of the end user at the destination of the end user's choosing. After reviewing the record evidence, the OCC concluded that the MegaPort traffic did not satisfy these requirements.

Other than its argument that all "calls" qualify for reciprocal compensation under the ICA—which we rejected above—CCCOK does not challenge the three-part test articulated by the OCC. For instance, CCCOK expressly acknowledges that to qualify for compensation under the ICA a "call[] must originate by a party's end user and terminate to the other party's end user." Aplt. Opening Br., at 28.

CCCOK argues, however, that "[c]ontrary to the OCC's findings, the MegaPort Traffic meets each of the[] requirements" in this three-part test. *Id.* at 14. Specifically, it contends that the record clearly establishes that: (1) the SWBT end users initiated the MegaPort Traffic, (2) the MegaPort Traffic was terminated at the direction of SWBT end users at the destinations of the end users' choosing, and (3) the MegaPort Traffic consisted of information of the SWBT end users' choosing.

For the reasons explained below, we conclude that the OCC's ruling that the SWBT end users did not originate the MegaPort Traffic was not arbitrary and capricious. Because we affirm the OCC's ruling that the MegaPort Traffic did not satisfy the first

17

element of the three-part test for determining whether telecommunications traffic qualifies for reciprocal compensation under the ICA, we need not and do not address the OCC's rulings that the MegaPort Traffic also failed to satisfy the second and third elements.

1. ***The OCC's Conclusion That The SWBT End Users Did Not Originate The MegaPort Traffic Was Not Arbitrary or Capricious***

The OCC determined that to qualify for reciprocal compensation under the ICA, telecommunications traffic must be originated by an SWBT end user. CCCOK does not dispute this determination. *See* Aplt. Opening Br., at 28.

The OCC concluded that the MegaPort Traffic did not satisfy this requirement. It reached this conclusion based on several factual findings. First, it found that there was "no evidence in the record to establish that any [SWBT] end user actually made use of the MegaPort service or originated any call on [SWBT's] network." *OCC Order*, at 3. Second, it found that there was no evidence that "any of the [auto-dialed] calls were related to any actual usage from [SWBT] end users." *Id.* Third, it found that "[t]he undisputed evidence show[ed] that the [MegaPort] [T]raffic was generated by equipment owned by [ZipRamp], installed at the [SWBT] end user's premises and programmed to operate as an auto-dialer." *Id.* at 4. Finally, it found that there was no "language in any of the documents that [the SWBT] end users signed that authorize[d] [CCCOK] or its affiliate ZipRamp to make calls on behalf of any of those end users." *Id.* Based on these findings, the OCC stated that the "MegaPort [T]raffic was not originated by [an SWBT] end user." *Id.* at 3.

18

CCCOK argues that the OCC's ruling that the SWBT end users did not originate the MegaPort Traffic ignores and contradicts undisputed record evidence. CCCOK does not dispute that the MegaPort Traffic was generated by the auto-dialed calls placed by the Lucent routers. But it contends that the terms of the ZipRamp Service Contract and Letters of Agency "clearly disclose that the SWBT [end users] agreed to allow ZipRamp to provide him or her with [the] MegaPort Service using the Lucent [routers] and SWBT's SuperTrunk service." Aplt. Opening Br., at 22. It claims that "the SWBT [end users] essentially authorized ZipRamp to use the Lucent [routers] and SuperTrunk service on his or her behalf" and that the SWBT end users thereby "authorized the origination of the MegaPort traffic." *Id.* at 22, 24.

As noted above, in relevant part, the ZipRamp Service Contract states:

1. **Introduction**: During the term (as defined below) of this Agreement, ZIPRAMP will provide Customer with MegaPort Service. Megaport Service is Broadband Internet Access Service that includes an allocation of ____ IP Addresses for the customer's sole and exclusive use, utilizing the equipment and facilities described . . . below. . . .

2. **Equipment and Facilities:** In order to facilitate MegaPort Service, ZIPRAMP will install a Lucent Max 4000 Router, or a comparable piece of equipment, on the customer premises, to which the customer's existing computer network will be connected. ZIPRAMP will, as agent for the customer as authorized by the attached Letter of Agency, order and install two (2) SuperTrunks from Southwestern Bell Telephone.

ROA, at 541-42.

The Letters of Agency referenced in the ZipRamp Service Contract state:

19

I hereby authorize ZipRamp, Inc. (ZipRamp), to act as my agent in provisioning and order two (2) SuperTrunks from Southwestern Bell Telephone as described in Southwestern Bell Telephone's Integrated Services Tariff, Part 4, Subpart 4.7. In addition, I further authorize ZipRamp to block optional services not limited to the following: Third Party Billing and Collect Calling, Long Distance and International Long Distance, All 900 Services, Three Way Calling, Call Return, Call Blocker, Auto Redial, Calling Card Services, PIC and LPIC. I also agree that I will not contract with Southwestern Bell Telephone to add any additional equipment or services to the circuits that are the subject of this agreement. I further authorize ZipRamp to handle the necessary arrangements, including billing and responding to any inquiries by Southwestern Bell Telephone.

ROA at 548.

We see nothing in the Service Contract or Letters of Agency that contradicts the OCC's finding that the SWBT end users/ZipRamp customers did not authorize ZipRamp to place the auto-dialed calls on their behalf. Nothing in the text of the Service Contract or Letters of Agency informed the ZipRamp customers that numerous concurrent auto-dialed telephone calls would be placed by the Lucent routers to ZipRamp 24 hours a day, seven days a week regardless of the customers' internet usage. Furthermore, there is no evidence in the record indicating that the ZipRamp customers knew or understood that ZipRamp had disabled the Lucent routers' dynamic bandwidth allocation feature to ensure that the routers would generate as many calls as possible even if the customers' computers were turned off. Additionally, there is no evidence in the record demonstrating that the ZipRamp customers ever used the MegaPort service or that they were aware of the auto-dialed telephone calls.

20

Based on the limited record evidence and the terms of the Service Contract and Letters of Agency, we conclude that the OCC's ruling that the SWBT end users did not originate the MegaPort Traffic did not "run[] counter to the evidence before [it]" and was not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Tidwell*, 603 F.3d at 793 (quotations omitted). We therefore hold that the OCC's ruling was not arbitrary or capricious.

Because we conclude that the MegaPort Traffic did not satisfy the first element of the three-part test for determining whether telecommunications traffic qualifies for reciprocal compensation under the ICA, we need not address the OCC's rulings that the MegaPort Traffic also failed to satisfy the second and third elements of that test.

## C. *The OCC's Statements Regarding CCCOK's Interpretation of the ICA*

Finally, we consider whether the OCC's statements regarding CCCOK's proposed interpretation of the ICA violated CCCOK's rights under state or federal law. We hold that they did not.

In its written order, the OCC noted that it found the pertinent sections of the ICA to be "clear and unambiguous." *OCC Order*, at 5. It then stated that it had conducted a thorough "review of the record" and concluded that the "MegaPort [T]raffic [did] not qualify for reciprocal compensation under the clear and unambiguous provisions of the ICA." *Id.* After stating this conclusion, the OCC stated in dicta:

> On the other hand, the interpretation of the ICA urged by [CCCOK] is unreasonable and contrary to the public interest, and would lead to unintended and absurd consequences. . . . The Commission cannot reasonably interpret the ICA to require compensation where—as here—the only economic

21

> purpose for the underlying service is the generation of reciprocal compensation. Neither can the Commission interpret the ICA to require compensation for a business practice by which the legitimate and trusting nature of schools, churches, and not-for-profit organizations were exploited. *Such an interpretation would be contrary to the public interest.*

*Id.* at 5 (emphasis added and quotations omitted).

CCCOK contends that the OCC's statement violated its rights under state and federal law. CCCOK argues that "[t]he OCC may not void [an] [ICA] without demonstrating that it violates a specific and clearly enunciated public policy." Aplt. Opening Br., at 29-30. It claims that "[t]he OCC failed to identify such a public policy" and that its "'public interest' findings are [therefore] contrary to CCCOK's rights under federal and state law." *Id.* at 29-30.

CCCOK's argument lacks merit. CCCOK contends that the OCC violated its rights under state and federal law by "voiding" the ICA "without demonstrating that it violate[d] a specific and clearly enunciated public policy." *Id.* But the OCC did not "void" the ICA, it *enforced* it. Indeed, throughout its Order, the OCC noted several times that it "base[d] its [ruling] on the clear and unambiguous language of the ICA." *OCC Order*, at 4-5.

Even if state or federal law prohibited the OCC from "voiding" an ICA without demonstrating that it violated a specific and clearly enunciated public policy, the OCC could not have violated such a law because it did *not* "void" the ICA. We therefore reject CCCOK's argument that the OCC's statements concerning CCCOK's interpretation of the ICA violated its rights under state or federal law.

## III. CONCLUSION

For the reasons discussed above, we hold that the OCC's interpretation of the ICA was reasonable and was not arbitrary or capricious. We further hold that the OCC's ruling that the MegaPort Traffic does not qualify for reciprocal compensation under the ICA because it was not originated by an SWBT end user does not contradict record evidence and was not arbitrary or capricious. Finally, we hold that the OCC's statements regarding CCCOK's proposed interpretation of the ICA did not violate CCCOK's rights under state or federal law. Based on these conclusions, we AFFIRM the district court's decision that the OCC's ruling was not arbitrary or capricious.

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge